**John O. HERRMAN, Plaintiff,**

v.

**William T. COLEMAN, Defendant.**

**Civ. A. No. 76–0786.**

United States District Court,
District of Columbia.

Feb. 22, 1977.

June D. W. Kalijarvi, Washington, D. C., for plaintiff.

Jeffrey B. Rosen, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This Title VII[1] action came on for a *de novo* trial pursuant to the procedures established by the Supreme Court in the *Chandler*[2] case.[3] This Memorandum Opinion will serve as the Court's Findings and Conclusions.

Plaintiff was a probationary police officer employed by the Federal Aviation Agency at the Washington National Airport. Previously he served in the United States Air Force for approximately three and one-half years and received an Honorable Discharge. He also worked as a desk clerk and as a Correctional Officer at the Lorton Reformatory,[4] from which position he transferred[5] to his position at the National Airport. He entered on duty at the National Airport on the 30th of June, 1974. He received his Notice of Termination June 27, 1975. He had worked approximately four weeks as a Correctional Officer at Lorton before being transferred to the Airport. It is his contention that this prior government service should be considered in connection with the determination of his probationary period. The Court finds it unnecessary to reach this contention which was not asserted in the complaint or at pretrial.

Plaintiff's principal contention in this case is that his termination was motivated by racial considerations. During the period of his service at the Airport, numerous witnesses, both black and white, testified that marked racial tension existed and that black officers, who constituted approximately 30 percent of the work force, formed a black officers' club, the purpose of which was to protect the basic rights of black officers and to achieve recognition of their civil rights. The thrust of plaintiff's case is that Chief Pyles, who was then in charge of the police force at the National Airport, in order to placate the black officers and assure them of his evenhandedness, recommended the termination of plaintiff, a white officer. It is plaintiff's further contention that reasons set forth in his Notice of Termination were either completely conclusory[6] and factually unsupported or, if they existed were ignored or overlooked in the case of black officers. The Court heard testimony from about a dozen witnesses including plaintiff's two Sergeant supervisors who stated that they had rated him as exceeding requirements or meeting them[7] and that they knew of no

1. Civil Rights Act of 1964, as amended by the Equal Opportunity Act of 1972, 42 U.S.C. §§ 2000e *et seq.*

2. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

3. It is noted that plaintiff has properly exhausted his administrative remedies as required by statute. *See* Defendant's Exhibits # 2 and # 3.

4. Plaintiff's Exhibit 8.

5. Plaintiff's Exhibit 10.

6. Plaintiff's Exhibit 11:
   Your general attitude and work performance have been unsatisfactory since you entered on duty. You have been habitually tardy for work and you have displayed a general disregard for authority and unwillingness to assume responsibility. Despite frequent counseling sessions, you have failed to improve. In an effort to improve your general attitude, you were sent to the Consolidated Federal Law Enforcement Training Center School in March, 1975 for an intensive two month training course. You failed to meet the minimum passing standard and your general attitude did not improve. Consequently, it is my conclusion that your separation from the agency will promote the efficiency of the service. Therefore, your career-conditional appointment as Airport Police Officer, GS–0083–04, salary $9,620, per annum, will be terminated on the close of business, June 27, 1975.

7. Sergeant Odell Shaw rated plaintiff's performance as "meets requirements" in three areas: general patrol duties, report writing and investigation; and communication. He also rated plaintiff's performance as "exceeds requirements" in three areas: technical skills; compliance—rules and regulations; and public relations—courtesy. Sergeant Shaw rated the skills knowledge and ability of plaintiff as "satisfactory" in four areas: producing acceptable work; planning and organizing work; writing skill; and skill in oral communication. Ser-

police officers who were terminated when such ratings were received. Sergeant Hilton, also a supervising Sergeant, also expected plaintiff's conversion. These two supervisors were black. R. J. Lawler, then Captain, now Chief of Airport Police, also knew of no officer with a satisfactory rating who was terminated. Plaintiff also called a number of police officers both black and white with whom he had worked directing traffic on the Airport Circle and at the passenger gates who described him as an outstanding police officer who performed his assigned duties in a thoroughly efficient, conscientious, and courteous manner. Plaintiff also explained through the testimony of others and through his own testimony that far from disregarding authority, as was alleged, he accepted counselling by his superiors when it was offered and it was shown through this testimony and that of defense witnesses, Chief Pyles, Captain (now Chief) Lawler, and Lieutenant Shaver, that none of them recalled counselling him a second time for any of the matters concerning which they had counselled him in the first instance, except tardiness.

The Notice of Termination specified that he was habitually tardy. There were 8 instances of tardiness during his service.[8] It was shown from the testimony of witnesses that some of these instances were of short duration—two, three, or five minutes—and that in some instances his supervisors accepted the excuse he offered. In one instance, while on his way to work, he had stopped to assist Officer Rodebaugh, who was seeking to move a tractor trailer on Airport property, which tractor trailer was impeding the flow of traffic in such a way as to delay passengers from proceeding to the point where they could process

through the Airport. On this occasion he was ultimately three minutes late. His supervisor accepted the explanation,[9] which had been checked out and excused plaintiff, but Chief Pyles and Lieutenant Shaver refused to do so. It was shown by the testimony of several witnesses that some black officers were tardy more frequently than was plaintiff—Officers Johnson, Halliday, Rodrigo and Charles—but that no disciplinary action other than counselling was meted out to them. In the case of Officer Franklin, a black female officer, she was tardy 6 times between August 6, 1976, and September 13, 1976. She was supposed to report at 7:00 A.M. She was allowed to report at 8:00 A.M. so that she would be more likely to be on time.[10] It was admitted by defense witnesses that no officer had ever been terminated solely for being tardy. There was no evidence that plaintiff was tardy during the final five months of his employment.

The charge brought against plaintiff considered most serious by his superiors resulted from an incident in which he placed a warning notice on an automobile. This vehicle was illegally parked in a loading and unloading zone reserved for passenger limousines, and for vehicles used by the handicapped. This vehicle, bearing Pennsylvania tags, was thought by the Chief to have been Senator Javits'[11] vehicle. While plaintiff did not put a parking ticket on this car, which was illegally parked in this location for approximately three or four days, he did write a note as follows: Congressperson or not, why don't you develop some common courtesy and leave your vehicle in the congressional lot where it belongs rather than making an already congested zone even more so just to save yourself some

---

geant Shaw rated the skills, knowledge and ability of plaintiff as "above average" in six areas: knowledge of principles and practices in own area of work; understanding work related to, but outside of, own specialty or own technical area; applying knowledge to practical situations; accepting responsibility; working with others; and meeting changing demands of the work situation. The Sergeant gave plaintiff an overall rating of "satisfactory." *See* Plaintiff's Exhibit 6.

8. Plaintiff's Exhibits 18, 19 and 20.

9. Plaintiff's Exhibits 37 and 38.

10. Plaintiff's Exhibit 2.

11. The Court will take judicial notice of the fact that Senator Jacob Javits represents New York.

walking.[12] The testimony was that the congressional parking zone was a short distance from the place where the vehicle had been left and that there were unoccupied spaces in that zone. Chief Pyles, testifying for the defense, stated that he was very much upset at this note left on the windshield of the unidentified car, which note, incidentally, was taken off the improperly parked vehicle by another policeman and delivered to the Chief. The Chief testified that Congressmen and Senators had constitutional immunity from arrest and he was concerned that their rights be respected.[13] It was brought out in other testimony that some officers did place tickets on improperly parked congressional vehicles. Sometimes they even had such vehicles towed away when those vehicles were blocking traffic. Lieutenant Shaver testified he had done this. Some officers, however, merely placed warning notices on windshields of improperly parked congressional vehicles and did not issue parking tickets. There seems to have been no uniformity in the practices followed by the members of the Airport police force. One of the officers who followed a practice similar to the action taken by plaintiff was a black officer, Calvin Charles. He was not terminated or disciplined. Plaintiff testified he did not know the vehicle was owned by a Congressman but that it was illegally parked in a space set aside for the handicapped and he thought the driver should get a warning. The Chief was annoyed and wanted to know what right a mere policeman had to approach a Congressman.

Failure to complete the consolidated police officers' training school was another reason alleged in the termination notice. A Stipulation was agreed upon that it was Federal Aviation Agency policy not to terminate a police officer's employment solely for failure to graduate at the police training school. Testimony was received from the head of the school that plaintiff obtained an extension of time within which to file a certain report, but that he did not file that report within the period of the extension and that failure to file the report resulted in plaintiff's failure to graduate. It was the testimony of the head of the school as well as others that policemen who failed to graduate were "recycled," that is to say, given a second opportunity at a future time. The record reflected also that plaintiff was ill at the time and that he was going through divorce proceedings. Testimony revealed that Officers Good and Johnson failed to complete the school but that they were not terminated but were converted from probationer to career status. Both are black.

Plaintiff is also charged with improper conduct in stopping an individual who claimed to be the Mayor of Minneapolis but who turned out to be one Nathan Miller, not otherwise identified, at the Northwest Airlines gate. It appears from the testimony that airline security personnel called upon the plaintiff for assistance when the alleged Mayor of Minneapolis refused to allow his bag to be processed through the x-ray screening device and insisted upon having the bag hand searched. The plaintiff required that the usual procedures be followed and when Mr. Miller wrote a letter complaining about plaintiff's conduct, this was the subject of counselling and deemed illustrative of plaintiff's unsatisfactory work performance. Lieutenant Shaver wrote two highly critical letters to plaintiff emphasizing that he, the Lieutenant, had on numerous occasions explained what an officer's duties are at gate positions. Chief Pyles testified as a defense witness that plaintiff had done what a police officer should have done and that this incident should not be held against plaintiff.[14] It

---

12. Defendant's Exhibit 1. Admittedly the note lacks the cadences so admired in the King James' version of the Bible nor does it have the ring of forgiveness ascribed to the teaching of the Master: It sought only to be a *memorable* warning from a policeman. That is was. It should hardly be the basis of a dismissal.

13. Plaintiff's Exhibits 1 and 15.

14. Here the Chief's conclusion is in harmony with Air Security Bulletin 72–2 dated 19 Dec. 1972. See Plaintiff's Exhibit 17. "Counselling" by Lieutenant Shaver was wide of the mark.

was brought out that Officer McCrae, a black, arrived late at a gate where his assignment was to screen passengers. He insisted that they be rescreened. No disciplinary action was taken. The termination notice alleged that plaintiff showed an unwillingness to assume responsibility. Here he assumed responsibility in a manner completely acceptable to Chief Pyles only to find himself written up by Lieutenant Shaver.

Among the witnesses plaintiff called was Officer Calvin Charles, a black officer who testified in substance that Chief Pyles had told him that he was not only picking on blacks but he was picking on whites as well, that he would show them there was no discrimination. Officer Stanwood Ivy, a black with nine years' experience, testified that plaintiff was a victim of circumstances. While he thought plaintiff would make a good officer, he was fired by Chief Pyles because the Chief wanted to show his fairness to the blacks. This was not denied by the defense. Another black officer, Boston Bennet, also testified that plaintiff was being made a scapegoat by Chief Pyles. He further testified that Chief Pyles terminated plaintiff to take the pressure off himself.

Another incident given as illustrating plaintiff's unsatisfactory performance of duty was that plaintiff wore what is described as a high ride holster rather than the swivel type Border Patrol holster, which had been prescribed as part of the uniform. Testimony revealed that some supervising personnel, the Chief, the Captain, and the Lieutenants, were permitted to wear the high ride holster and that certain other officers, including some of the blacks, for instance, Officers Boston Bennet and the

plaintiff, continued to wear the high ride holster, which they preferred.[15] Officer Bennet was not disciplined for wearing the high ride holster. When plaintiff was counselled to wear the swivel type holster he provided a medical excuse as his reason for wearing the high ride holster, though subsequently he complied with the directive to wear the swivel type holster.[16] Lieutenant Shaver considered plaintiff's act in wearing the high ride holster as showing that he was out of uniform. It was also shown that although the uniform regulations specified that officers wear black socks, Officer Coaxun, a black officer, was permitted to wear white socks for medical reasons.[17]

Another counselling incident was that on one occasion his car was found to be parked improperly. After being counselled there was no repetition of this violation. It was shown that some black officers parked their vehicles illegally but no action was taken concerning them other than to transport them from their duty station to where their vehicle was parked so that they might re-park their vehicle in the area reserved for policemen and then return them to their duty station.

Upon consideration of plaintiff's case, the Court ruled that plaintiff had made out a *prima facie* case of discrimination and overruled the government's motion for dismissal. Thereupon the defendant called former Chief Pyles, the present Chief and former Captain Lawler, Lieutenant Shaver, and the Director of the school, Mr. Dooher. Former Chief Pyles determined to make the recommendation for termination without discussing the matter with plaintiff's supervising Sergeants who had the most detailed information about the performance of his duties

---

**15.** Plaintiff's Exhibit 16, pgs. 1–2:

You shall carry your badge and revolver with you at all times when in the District of Columbia. Your revolver shall be carried in a holster, with the safety strap snapped, the holster attached to a leather belt by passing the belt through the holster loop.
The carrying position is a personal one.
You should keep in mind that you want the revolver where you can get it should you need it. Possibly the side position is the one most used. The holster should never be

carried in the hip pocket. When carried there while wearing outer garments it is almost impossible to get the revolver from the holster.

**16.** Plaintiff's Exhibit 21.

**17.** Officer Stanwood Ivy testified that in his nine years' experience as a police officer at the Airport he had observed that it was the policy to permit variances in the uniform for medical reasons.

and without knowing their evaluation of him. He talked with plaintiff three or four times during the plaintiff's year of duty and was unaware of plaintiff's performance evaluation report by the Sergeants. None of the defense witnesses questioned the adequacy of plaintiff's writing skill, although the prime reason for plaintiff's failure to graduate from the school was his failure to submit the Carey report, which was designed to reflect one's writing ability. Chief Pyles did not discuss the possibility of recycling plaintiff, i. e., permitting him to complete his work at the school at the next session. This privilege had been accorded certain black officers.

Chief Lawler was present when former Chief Pyles counselled plaintiff about the note left on the illegally parked Pennsylvania licensed vehicle believed to have some connection with Senator Javits. Plaintiff thought he was correct in warning the driver of the illegally parked vehicle. Chief Lawler stated the school was designed to make the police force more professional. Plaintiff's graduation depended on his submitting the Carey report. Officer Johnson, a black officer, was converted to career status without graduating from the school and permitted to attend the school the following year. Chief Lawler conceded that obtaining a passing grade in school was not a precondition to being converted from probationary status to career status. Though he knew that Sergeant Shaw, plaintiff's supervisor, had given plaintiff a satisfactory rating, he does not recall bringing that to Chief Pyles' attention. He knows of no other officers who were terminated at a time when they had satisfactory ratings. He knew of plaintiff's domestic problems. He does not regard plaintiff's act in assisting Officer Rodebaugh in getting a tractor trailer off the roadway of the Airport where it was impeding traffic as a result of which plaintiff was three minutes late as an excuse for tardiness.

The Assistant Director of the school, Mr. Dooher, was also called as a witness for the defense. He knew of plaintiff's domestic problems but emphasized the importance of completing the Carey report. This report was designed to demonstrate a student's writing skills. Plaintiff got an extension of time within which to file his report after the due date but failed to submit his report within the scheduled time. Accordingly, he got a zero for this course which carried a maximum of 60 points. Plaintiff accumulated 387 points; the minimum passing grade was 428 points. Accordingly plaintiff's failure to submit the Carey report was the cause of his failure to graduate. Plaintiff also failed to complete the Human Relations course and received "0". Mr. Dooher explained that the agency could have elected to withdraw plaintiff from the school and recycle him at a future date. He said there was no question but that plaintiff had the requisite ability to do the work required at the school. A black officer by the name of Good failed to achieve a passing grade at the school but was not terminated by the agency. He noted that plaintiff was cooperative and respectful and thought the reason for plaintiff's failure to complete the course was his personal problems.

■ Upon consideration of the foregoing facts, the Court concludes as follows: Plaintiff made out a *prima facie* case within the scope of the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff showed that he was a member of a protected class within the scope of Title VII, see *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); that as a probationary employee he demonstrated qualifications for continued employment; that in spite of this demonstration of qualifications for continued employment, he was terminated and that other employees who were black and whose qualifications and performance of duty were inferior to plaintiff's were retained and converted from probationary to nonprobationary status.

■ Plaintiff having met the standards set forth in *McDonnell Douglas Corp. v. Green, supra*, is entitled to prevail unless the defendant demonstrates a legitimate

nondiscriminatory reason for plaintiff's termination. If the defendant meets this burden by clear and convincing evidence [18] then the Court must determine whether the reasons for the termination were a pretext. The excuses advanced by the defendant in an attempt to justify plaintiff's termination, discussed at length *supra*, do not in the Court's view amount to a legitimate nondiscriminatory reason for that action. The Court concludes as a result of compelling evidence which *seriatim* discredits each of the "reasons" that the defendant has advanced [19] and it finds that they neither individually nor collectively satisfy defendant's rebuttal burden. The overwhelming evidence from witnesses with whom plaintiff worked, both black officers and white officers, was that the manner in which plaintiff performed his duties was at least satisfactory or average. His immediate supervisor, Sergeant Shaw, in half the categories rated his performance as meeting requirements and the remaining half as exceeding requirements.[20] This supervising Sergeant is black. Most of his fellow officers, black and white, who testified characterized plaintiff as a fine officer, as outstanding, and stated that his performance of his duties exceeded some of their fellow blacks and even in some instances, their own. Nevertheless, these black officers who were named in the testimony were not terminated but were promoted to nonprobationary status.

The explanation offered by several black officers was that severe racial tension existed at the Airport as a result of which the black officers organized a black officers' club. Chief Pyles refused to meet with the black officers' club but did say in substance to one of its members: You think I'm picking on the black officers. I will show you I can pick on the white officers also. The witnesses interpreted this remark as indicating Chief Pyles' determination to make a "scapegoat" of plaintiff, inferring that had plaintiff been black he would not have been terminated. This obviously is no way to demonstrate absence of discrimination. This clearly demonstrates the reason for such remedial legislation as that contained in Title VII.[21] It is therefore the Court's conclusion that the defense has failed in its burden to demonstrate a legitimate nondiscriminatory reason for plaintiff's termination. The Court finds in favor of the plaintiff. Counsel will submit an appropriate order.

---

**18.** *Day v. Mathews*, 174 U.S.App.D.C. 231, 530 F.2d 1083, 1085 (1976).

**19.** The Court need not elaborate on its textual discussion of these "reasons" but will point out that each suffers from a major defect. Plaintiff's performance at training school, for example, does not warrant his termination because it is uncontested that the successful completion of such training is not a requirement for conversion to career status. Similarly, it is also uncontested that an officer's tardiness may not alone constitute sufficient cause for his termination. The same could be readily said for plaintiff's single parking violation, an infraction which was not repeated after plaintiff was counselled about it. With respect to the incident involving the alleged Mayor of Minneapolis, it is conceded by Chief Pyles that plaintiff's actions were perfectly proper. The holster issue, on the other hand, was vigorously asserted by the defendant, but an abundance of evidence showed that the choice of holster was in fact left to the personal preference of most officers. Finally, plaintiff's conduct in connection with the alleged Congressperson's car, although not exemplary, does not constitute cause for termination in light of the vague standards and diverse practices revealed by the testimony on the point.

When considered in the context of the above analysis, the defendant's conclusory reasons for terminating plaintiff are also without foundation—especially in light of the abundant evidence indicating that he did indeed respond well to counselling, assume responsibility, and did respect the authority of his supervisors.

**20.** See note 6 *supra*.

**21.** *Day v. Mathews, supra*, 174 U.S.App.D.C. at 234, 530 F.2d at 1086, quoting from *Albemarle Paper Co. v. Moody*, 422 U.S. 405 at 421, 95 S.Ct. 2362, 45 L.Ed.2d 280; and see *McDonald v. Santa Fe Trail Transportation Co., supra*.