**DETROIT POLICE OFFICERS ASSOCIATION, a Voluntary Mutual Benefit Association, Labor Organization, Plaintiff,**

v.

**Coleman A. YOUNG, Mayor of the City of Detroit, Philip G. Tannian, Chief of Police of the Detroit Police Department, Avern Cohn, Susan Cooper, Charles Butler, Edward Littlejohn and Alexander Ritchie, Members of the Board of Police Commissioners and the City of Detroit, a Municipal Corporation, Defendants.**

**William MORGAN, Brian Brunett, and Donald Prince, Individually and as Representatives of a Class, Plaintiffs,**

v.

**Coleman A. YOUNG, Mayor of the City of Detroit, Philip G. Tannian, Chief of Police of the Detroit Police Department, Avern Cohn, Susan Cooper, Charles Butler, Edward Littlejohn and Alexander Ritchie, Members of the Board of Police Commissioners and the City of Detroit, a Municipal Corporation, Defendants.**

**Civ. A. Nos. 74–71838 and 75–71376.**

United States District Court,
E. D. Michigan, S. D.

Feb. 27, 1978.

---

**3.** See note 2 *supra.*

Walter S. Nussbaum and Sheldon H. Adler, Nussbaum, McEvoy & Adler, Southfield, Mich., for Detroit Police Officers Ass'n.

John F. Brady and Jane K. Souris, Riley & Roumell, Detroit, Mich., for plaintiffs.

James R. Andary and Elliot S. Hall, Hall & Andary, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

KAESS, District Judge.

The above entitled actions arise out of separate civil rights complaints alleging discriminatory promotional practices on the part of the City of Detroit and other named individual defendants. The complaints and amendments in both actions charge defend-

ants with violations of 42 U.S.C. §§ 1981, 1983, 1985(3), 2000d *et seq.,* 2000e *et seq.,* the Fourteenth Amendment of the United States Constitution, Article I, Section 2 of the Constitution of the State of Michigan and various state civil rights statutes. Specifically, plaintiffs allege that the promotional practices within the Detroit Police Department resulted in white male police officers being intentionally passed over for promotion to the rank of Sergeant solely because of their race.

On November 18, 1976, the Court certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the individual plaintiffs' suit as a class action.[1] Thereafter, on March 29, 1977, the Court entered an Order consolidating the above entitled cases for trial.[2]

A preliminary injunction was issued on May 27, 1977, enjoining defendants herein from making further promotions to the rank of Sergeant in accordance with the affirmative action program of the Detroit Police Department. The injunction required all further promotions to be made in strict numerical ranking as established by the current sergeants promotional register. On June 23, 1977, the United States Court of Appeals for the Sixth Circuit entered an Order dissolving the preliminary injunction and remanded the cause for a prompt hearing and determination on the merits.

Upon remand the Court, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, entered an Order bifurcating trial on the issues of liability and damages. Trial of the consolidated actions on the issue of liability began on August 8, 1977, and concluded on December 22, 1977. All parties have rested and final arguments have been made and received.

The following constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### The Disputed Promotions

On November 1, 1973, notice was given by the Detroit Police Department that a promotional examination for the rank of Sergeant would be given. The notice provided eligibility requirements and stated, *inter alia,* that eligible candidates would be permitted to write the examination and receive their "merited" position on the promotional register.[3] The notice also provided that officers would be selected to attend Officer Candidate School in descending order according to their position on the eligible register.

On December 16, 1973, the written examination for promotion to the rank of Sergeant was administered to eligible police officers of the City of Detroit by the Detroit Police Department. On April 9, 1974, a list of applicants eligible for the position of Sergeant, arranged in descending order of their total composite score, after application of the promotional model,[4] was caused to be prepared and resulted in Personnel Order 74–108. The order provided that applicants for promotion will be promoted in the order that they appear on the eligibility register provided they are in compliance with specified college requirements or seniority requirements. Thus, if an applicant had not met the college or seniority requirements prior to graduation from Officer Candidate School he would be passed over

1. The class certified was defined as follows: "All past, present and future qualified white Detroit Police Officers below the rank of Sergeant who, since April of 1974, have been or will be denied, because they are white, their timely promotions to the rank of Sergeant."

2. The D.P.O.A. suit had been originally assigned to District Judge Lawrence Gubow. However, by mutual agreement between Judge Gubow, this Court and all parties, the matter was reassigned to this Court pursuant to Local

Rule IV(c); *See* Rule 42(a), Federal Rules of Civil Procedure.

3. 70% was the designated minimum passing score on the written examination. Thus, any candidate who did not achieve 70% was excluded from further consideration in the promotional process. The cut-off score has never been a subject of dispute in this litigation.

4. The promotional model and composite scoring are discussed, at page 988, *infra.*

for promotion. Likewise, if an officer selected from the eligibility register did not successfully complete Officer Candidate School, he too would be passed over as successful completion was a prerequisite to confirmation to the rank of Sergeant. The names of 298 officers appeared on the eligibility register.

On May 9, 1974, Police Commissioner Philip Tannian authorized the first set of promotions to be made from eligibility register 74–108. These promotions, totalling thirty (30), were made in strict descending numerical order and were racially composed of twenty-nine (29) caucasians and one (1) non-caucasian. Subsequently, on June 7, 1974, Personnel Order 74–108 was amended and the eligibility register for Sergeant was extended by the addition of 77 police officers, numbers 299–375, inclusive. The names of these eligible officers were again arranged in descending order according to their weighted composite scores after application of the promotional model. The amendment provided that promotions from the eligibility register will be made in accordance with the provisions of the new City Charter.[5] It was also on this date that Commissioner Tannian rescinded a prior order which stated that promotional candidates will be selected to attend Officer Candidate School in the order of their position on the eligibility register, starting at the top of the list.

Thereafter, on August 1, 1974, a second set of promotions to the rank of Sergeant was made from eligibility register 74–108. These promotions, again totalling thirty (30), were not made in strict numerical order as the names appeared on the April, 1974 eligibility register but instead involved passing over approximately 200 white officers with higher composite scores and standing on the eligibility register. Of the thirty (30) promotions, twenty-five (25) went to male officers and five (5) were bestowed upon females. All twenty-five (25) officers promoted were black and ranged in numerical rank on the eligibility register from # 36 to # 264.

The third set of promotions to the rank of Sergeant from the eligibility register, and its extension, were made on October 11, 1974. Of the thirty-three (33) promotions, four (4) were received by females, fifteen (15) were awarded to white males and fourteen (14) were awarded to black males. Excluding the female promotions from consideration, the white male promotions were made in strict numerical order according to their respective positions on the eligibility register. While the black male promotions were apparently made in the same manner this process required selection of every remaining black male on the eligibility register and its extension. There was, in actuality, two lists, one for white males and one for black males. The positions of the black male officers promoted ranged from # 276 to # 375, the last number on the list, and required the passing over of every remaining white male.

The 1974 eligibility register was amended for a second time on January 6, 1975, extending the eligibility register for the rank of Sergeant to include an additional 125 police officers. These officers ranked # 376 to # 500, inclusive. The personnel order provides the alleged purpose for the extension stating, in part, as follows:

"In order to provide the department with additional Sergeants and to comply with the affirmative action resolution as adopted by the Board of Police Commissioners on July 31, 1974, it is necessary to extend the eligibility register for the rank of Sergeant.

The register has been extended to the position 500 to insure that a sufficient number of officers are available for promotion prior to the publishing of a new eligibility register." (Exhibit 6)

The true reason why the eligibility register was extended was to have more *black male* officers available for promotion since the prior promotions had exhausted all eligible black male candidates. It was not to insure the department that there would be "sufficient" officers available. The only

purpose of the extension was to insure the department that there would be sufficient *black male* officers available.[6] This fact is evidenced by the exhibit itself as only black males were promoted from the extension.

Promotions were again made from the 1974 eligibility register and its extensions on February 12, 1975. Of the twenty (20) promotees, four (4) were females, eight (8) were black males and eight (8) were white males. The male promotions were made by selecting the eight (8) highest ranking black and white officers on the original register and its extensions. Naturally, all the black males were positioned on the second extension. The white males promoted ranged from # 49 to # 57 on the eligibility register while their black counterparts ranged from # 376 to # 414 on the second extension.

The fifth, and final, set of promotions from the eligibility register and its two extensions was made on March 27, 1975. Thirty-six (36) promotions were awarded. Three (3) promotions were awarded to females, eighteen (18) to white males and fifteen (15) to black males. The white male promotions were again made in strict numerical order according to their position on the eligibility register. The black male promotions were made in the same manner and again required the selection of every black male on the second extension. The lowest ranking white male promoted was # 79 while the lowest ranking black male was positioned at # 494.

On September 10, 1974, notice of a second promotional examination for promotion to the rank of Sergeant was given to police officers. The notice provided that the attained position on the eligibility register was a "merited position". However, the language stating that officers would be selected for promotion by starting at the top of the list was deleted. The written examination was administered on November 17, 1974. After the examination was scored and the promotional model applied, a new eligibility register for promotion to the rank of Sergeant was released, Personnel

Order 75–352. The candidates were arranged in descending order according to their accumulated promotional score. The register represented that the candidates would be promoted in accordance with the "needs of the department" as determined by the Chief of Police and the Affirmative Action principles supported by the City Charter, Board of Police Commissioners and department policy. The expiration date of the register was June 30, 1976.

Three sets of promotions in 1976 were made from this eligibility register and resulted in 127 total promotions. A breakdown of the three sets of promotions reveals that each time an equal number of black males and white males were promoted. Specifically, the total shows the composition to be as follows: 59 black males, 59 white males, 9 females. As with the 1974–1975 promotions, the process of selecting officers to be promoted was not by true or strict numerical rank but was in fact done by coding the eligibility register by race and sex and then, in a descending order, selecting an equal number of black males and white males from each group. The last white male promoted pursuant to this practice was # 70 while the last black male promoted was # 342.

On May 23, 1976, the third promotional examination for promotion to the rank of Sergeant was administered. Again, prior notice was given stating that the attained position on the eligibility register was a merited one but that promotions would be made "pursuant to the needs of the department". The eligibility register, which was released on December 28, 1976, was arranged in descending order according to the total accumulated score of each candidate after application of the promotional model. The list included 460 officers. Its expiration date was stated as December 30, 1977. On June 30, 1977, after reversal of this Court's preliminary injunction, sixty-nine (69) promotions to the rank of Sergeant were made from the 1976 eligibility register. Excluding the nine (9) females pro-

---

**6.** Reluctantly, Tannian corroborated this fact.

moted, the racial composition of the males promoted was equal, thirty (30) white males and thirty (30) black males. The last white male promoted was # 42 on the eligibility register while the last black male promoted was # 116. The process of selection was again made by use of a register coded with race and sex designations and, in effect, required the use of two eligibility registers for males.

Prior to the August 1, 1974, promotions, promotions to the rank of Sergeant had always been made in strict numerical rank according to the current eligibility register. No candidate was passed over or promoted on account of race as skin pigmentation was accorded no weight in the promotional process. Further, the evidence shows that all the white male officers who were passed over would have been promoted but for the color of their skin.

### The Promotional Process

The notice of promotional examination dated November 1, 1973, stated that in order to be *promoted* to the rank of Sergeant it was a requirement that a candidate either have completed 12½ years of current service, commonly known as the grandfather clause, or have earned fifteen (15) quarter hours or ten (10) semester hours of college credit. However, in order to *sit* for the written examination all officers had to satisfy one of the following three eligibility requirements: (1) completion of three years service; (2) completion of 2½ years service and 2 years of college; or (3) completion of 2 years service and possess a four year college degree.

The promotional model for the 1973 process was comprised of five weighted component parts. These parts and their respective weights were as follows: (1) Written Examination, 60%; (2) Performance Evaluation Ratings or Service Ratings, 30%; (3) Seniority, 8% maximum; (4) College Credit and (5) Veteran's Preference. The combined maximum for (4) and (5) was 2%.

The Performance Evaluation rating score was determined by averaging the ratings attained by the candidate on his last two the first through 20th year of service and ⅛th of one through 24th year of service. the first through 20th year of service and ⅛ th of one through 24th year of service. College credit was computed on the basis of ½ of one percent per full year of college. Veteran's Preference was controlled by city ordinance.[7]

In 1974 the promotional model, as applied to the November, 1974 examination, was changed. The written examination weight was increased from 60% to 65%. Performance evaluation ratings were decreased from 30% to 15%. An oral board, or promotional evaluation board, was installed as a sixth factor and assigned a weight of 10%. Seniority was reduced to a maximum of 6% and computed on the basis of one percent per year for the first through fifth year of service and ½ of one percent for the sixth and seventh year. The college credit and veteran's preference components were increased to a maximum of 2% each, no longer 2% combined. Further, in order for a candidate, who did not qualify under the grandfather clause, to be promoted off the eligibility register he must have successfully completed 30 quarter or 20 semester hours of college, double the amount previously required.[8]

In 1976 the promotional model, including all component factors and weights, remained the same. However, in order to be *promoted* off the eligibility register the candidate must have completed 45 quarter or 30 semester hours of college credit if the candidate did not qualify under the requirements of the grandfather clause. Thus, greater emphasis was again placed on college education.

### The Written Examination

A history of the promotional process shows that prior to 1969 intelligence quotient was accorded heavy emphasis in the

---

7. Detroit, Michigan, City Code, Veteran's Preference, 385–F § 16–8–14.

8. The requirements to *sit* for the written examination remained the same.

written promotional examination.[9] In 1969, after serious evaluation of the written promotional examination, changes [10] began being instituted under the direction of Commander Richard Caretti to assure the elimination of any factor having a "disparate impact" upon minorities taking the examination.[11] While these changes were definite improvements, it was in the 1973–1976 period where the most extensive changes occurred.

The objective and charge of Caretti in preparing the 1973, 1974 and 1976 written examinations was to eliminate any existing cultural or racial bias of former examinations by making the examinations as "content valid" as possible. Caretti was intent upon complying with existing federal testing guidelines and totally committed to eliminating old barriers, if any, which curbed the upward mobility of any racial or ethnic group.

The first step toward this goal was made by attempting to define the current essential knowledge, skills or behaviors required for satisfactory performance in the position of Sergeant through job analyses prepared by Caretti and two outside experts.[12] Once the job analysis was completed for each promotional examination the actual examination questions were prepared. As with the job analyses, experts, inside and outside the department familiar with police personnel, were utilized in preparing specific sec-tions of examination questions. The questions selected for use consisted of representative samples of the performance domain as defined by the job analysis and included aspects of performance which differentiated among levels of successful job performance. These questions pertained to major or critical work behaviors as this concept was a key focal point throughout the project.[13] The knowledge sought to be tested was not of a type which could be acquired in a brief orientation to the job. Terminology used in test questions was specifically chosen to reflect a job related vocabulary. Additionally, the conditions under the 1973–1976 examinations were administered and scored were both controlled and standardized with safeguards instituted to protect the security of the testing and scoring process. Finally, Caretti attempted to achieve a staff racially composed of both whites and blacks in an effort to achieve input from both racial groups.

Caretti's efforts on the 1973–1976 examinations resulted in tests which measured relative differences of probable job success between candidates for promotion. All the evidence in the record demonstrates, and this Court finds as fact, that these examinations were in conformity with American Psychological Association Testing Standards and Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures. Dr. Wollack, a psychometrician, stated that after evaluating the

9. There was, however, no evidence presented showing what impact, if any, these examinations had upon either black or white candidates for promotion. As Commander Caretti related, pass/fail rates by race were not recorded prior to 1973.

10. For example, in 1970 the time in grade requirement to sit for the written exam was reduced to its present form in an attempt to increase the department's minority representation. The evidence shows that from 1961 to 1970 the time in grade requirement ranged from seven to two years depending on the college education of the candidate.

11. Caretti was qualified as an expert in testing and personnel selection. He was responsible for the preparation of promotional exams given in 1969 and 1971. Additionally, Caretti has directed the preparation of every promotional exam for the rank of Sergeant from 1969 to the present date. His competency as the preparer of these examinations, or his qualification as an expert, has never been disputed by the defendants.

12. John Furcon in 1973, Andres Inn in 1975.

13. The critical work behaviors were fully described in the examination notices and contained sections on Supervision and Police Community Relations, Presentation of Evidence, Department Procedure including general orders, Leadership in special situations, Command requirements, Witnesses at crime scenes, Traffic laws, Liquor laws, City ordinances, Verbal skills, Training information bulletins, Criminal law, Criminal investigation, and Constitutional limitations on search, seizure, arrest and evidence.

process used by Caretti in preparing these promotional examinations he was of the opinion that they were fully job related and content valid.[14] Dr. Wollack also had the benefit of personally reviewing the actual 1973 and 1974 examinations to support his opinion. Additionally, he had prepared and studied an item analysis on the 1974 examination.[15] Dr. Wollack also concluded that there was no suitable alternative to the written examination which would have less adverse racial impact. Dr. Ebel, also a psychometrician, corroborated Dr. Wollack's findings and conclusions that the examinations were content valid. None of the plaintiffs' evidence regarding validity of the 1973–1976 written examinations has been challenged by the defendants. The Court accepts the testimony of Caretti, Wollack and Ebel and finds, as fact, that the 1973–1976 written examinations were professionally developed, tested areas which closely approximated the tasks to be performed on the job by the promotional candidates and were content valid in all respects.

Finally, the Court notes that the pass rate for the 1973, 1974 and 1976 written examinations for white males was 43%, 53% and 51%, respectively. Conversely, the pass rate for black males on the same examinations was 28%, 39% and 42%, respectively. Thus, mathematically, the selection rate of black males vis a vis white males regarding the 1973–1976 written examinations was 65.1%, 73.2%, 82.4%, respectively.[16]

*Performance Evaluation Ratings*

Performance evaluation ratings, or service ratings, encompassed 20 factors of equal weight.[17] Each factor was scored on a range of one to five points with the maximum total of 100. All police officers were rated twice a year [18] by at least two, and preferably three, officers of superior rank. Additionally, in order to qualify as a rating officer the ranking officer should have supervised the candidate for a minimum of three months during the rating period. Separate evaluations were not made by each rater. Instead, the completion of the form represented the combined thinking of both raters. In order to guide and assist raters and to make the program meaningful, a set of guidelines on service ratings was published and made available to all raters. The guidelines counseled the rater to be objective and cautioned against bias and prejudice.

After each officer was rated he would be personally apprised of the evaluation by one of the raters and informed of any noted shortcomings so that a plan of corrective measures could be outlined and implemented. The rated officer was required to sign his service rating form after completion. If he wished to appeal his rating the officer had to make a written request within thirty (30) days of receipt of the rating citing the basis for his appeal. A two member service rating appeal board convened to hear the appeal. The hearing would be attended by the two rating superiors, the officer submitting the appeal, and his commanding officer. At the conclusion of the hearing a complete report including recommendations would be prepared and forwarded to the Chief of Police for review. The report would then be reviewed and sent back for final disposition.

There was no minimum required score on service ratings in order to be eligible to sit for the written examination. As previously

---

14. Content validity can be loosely defined as tests whose content closely approximates tasks to be performed on the job by the candidate.

15. The item analysis showed that, as a group, those persons on the 1974 eligibility register who were passed over and would have been promoted but for the passovers, scored better on 249 out of 366 questions than the group promoted out of order.

16. Exhibits 198–200.

17. Appearance, Cooperation, Enthusiasm, Flexibility, Good Judgment, Lack of Prejudice, Level of General Knowledge, Level of Specialized Knowledge, Maturity, Moral Courage, Motivation, Patience, Quality of Work, Quantity of Work, Reliability, Resourcefulness, Self-Improvement, Speaking Ability, Tact and Writing Ability.

18. For a brief period of time bi-monthly ratings were installed, Exhibits 47 and 48.

stated, service ratings were reduced from 30% in 1973 to its present 15% weight in 1974.

Caretti evaluated the service rating factor for the 1973 examination by dividing the eligibility register, and amendments, into two racial groups, black and white, and then dividing each group into four classes of seniority.[19] The analysis revealed that service ratings for both racial groups increased with the seniority of the candidates. Further, the study revealed that within the four classes of seniority blacks fared as well as their white counterparts.[20] The analysis showed that blacks with similar seniority tended to have slightly higher service ratings.

In the 1975 Equal Employment Opportunity Plan (EEOP) of the Detroit Police Department performance evaluation ratings are said to be an integral and necessary part of the promotional selection model.[21] Further, the plan reiterates the fact that service ratings have been carefully examined and its impact has been assessed. The plan states that the service rating factor does not have any systematically disparate impact on the promotional opportunities of minorities.

The Court finds, in accepting and relying upon these above facts, that service ratings, throughout the period of 1973 to the present date, have not been shown to have any disparate impact upon blacks or to discriminate against blacks in any manner in the promotional process.[22] Further, there is no evidence in the record showing discrimination against any group in the service rating factor prior to 1973.

### Promotional Evaluation Board or Oral Board

In 1974 the Detroit Police Department inserted an oral board procedure into the promotional process and assigned it a weight of 10%. One of the key reasons for installation of the oral board was to reduce any potential adverse impact service ratings might have and to test candidates in areas not dealt with in other segments of the promotional model. Each board was composed of three officers above the rank of Sergeant from major police agencies around the country. These officers were selected on the basis of reputation in an effort to maintain objectivity in the process. All boards were required to consist of at least one black.

The evidence shows, and this Court finds as fact, that the oral boards were professionally developed and applied. Safeguards existed in the form of an extensive appeal procedure. Moreover, the evidence shows that as a group blacks scored somewhat higher on the oral boards than did their white counterparts. The department was very satisfied with the results of the oral board procedures.

Regarding the oral board component of the promotional process there has been little dispute as to whether the oral board discriminated against any racial group. The evidence shows, and this Court finds, as fact, that it did not.

---

**19.** The four classes were 3 years, 4–5 years, 6–10 years, and over 10 years.

**20.** No study has been performed on the results of the 1974 or 1976 eligibility registers regarding service ratings.

**21.** Caretti and Wollack corroborated this fact.

**22.** The Court finds it necessary at this point to note the clear error by the EEOC in its decision in *Baumgart, et al. v. Detroit Police Department, et al.*, Charge No. TDT5–0067, TDT6–1070, TDT6–1071 (exhibit 308). At page 14 of its decision, Table 7, the EEOC represents certain "Median service rating" of black and white candidates being in excess of 100, the highest possible score for a candidate's service rating. These figures are obviously erroneous and taint the intended analysis. Also, at page 11, the EEOC characterizes performance evaluation ratings as having a "systematically disparate effect on the promotional opportunities of minorities" relying upon certain statistical observations. In light of the evidence in this record, especially Caretti's analysis, the EEOC's analysis and conclusions are clearly erroneous. The Court is unaware of the particular evidence presented to the Commission on this factor but notes that its statistical analysis is particularly shallow. Accordingly, the Court places no weight on the EEOC decision regarding service ratings or their impact on black candidates for promotion.

## Seniority

Prior to August, 1970 seniority was accorded a maximum of 10% in the promotional process. In August of that year it was reduced to a maximum of 8%. In 1974 seniority was again reduced to a maximum of 6%.

The reason for the diminished emphasis on seniority as a factor in the promotional model was two-fold. First, it was felt that a reduction in the weighting of seniority would benefit minorities since, as a group, a majority had been on the force a short period of time and therefore had less seniority. Second, and more importantly, it was felt that seniority over seven years had diminished importance in terms of potential job success at the rank of Sergeant.[23]

Since 1968 all collective bargaining agreements negotiated between plaintiff, D.P. O.A., and the defendant, City of Detroit, have contained seniority provisions which grant seniority benefits to all employees regardless of race. The evidence clearly shows, and this Court finds as fact, that these provisions were the result of good faith arms length negotiations between the parties free from any intention to discriminate against any racial group.

No studies have been placed into evidence showing what impact seniority had upon black candidates for promotion vis a vis white candidates for promotion. However, the evidence does show that seniority equally affected blacks as well as whites and that if this factor discriminated it did so against the younger, less senior officers without regard to their race. The Court finds not one scintilla of evidence to show intentional discrimination against either race regarding the insertion of seniority into the promotional process as a factor or regarding its insertion into the collective bargaining agreements between the parties.

Further supporting the Court's finding of non-discrimination in the seniority component is the EEOP of the Detroit Police Department. The department represented to the Law Enforcement Assistance Administration (LEAA) in submitting its plan that "the present formula that computes seniority to a maximum of six percentage points has no adverse effect on the promotional opportunities of minorities."[24]

## Veteran's Preference

Veteran's preference was inserted as a component in the promotional model via Detroit City Ordinance.[25]

There has been no evidence presented to the Court showing that this facially neutral factor was racially discriminatory vis a vis black males or white males. No studies were presented to the Court showing what impact, disparate or otherwise, the veteran's preference factor has on either race. However, after examination of the 1973–1976 eligibility registers and their amendments the Court concludes that the veteran's preference factor discriminates against neither race.

## College Credit

Since 1970 college education has been assigned a maximum of 2% in the promotional model computed on the basis of ½ of one percent per year. College credit was viewed by Caretti and the department as being job related because it heightened the officer's receptiveness to different points of view. Viewing education as such, officers, both black and white, had available both city and federal funds via the department if they sought a college education.

No evidence has been presented to the Court, either statistical or testimonial, showing racial discrimination in the inclusion or application of this component. Thus, the Court finds the facially neutral educational factor to be non-discriminatory.

## The Entire Promotional Model

It is important to note that the Detroit Police Department has no written valida-

---

**23.** See Exhibit 190, p. 63 and Caretti's testimony that "there is little difference between one year of seniority and one year twenty times."

**24.** Exhibit 190, p. 64.

**25.** Detroit City Code, § 16–8–14, Veteran's Preference.

tion report regarding the 1973–1976 examinations or the promotional models. However, equally important to note is the fact that Caretti, Wollack, Guenther and Ebel consistently testified that the promotional models for 1973–1976, including each component part, were job related and content valid. The testimony consistently was, and this Court finds to be fact, that the higher a candidate stood on the eligibility register the better qualified and equipped he was to assume the position of Sergeant. The above mentioned witnesses testified, and the Court accepts as fact, that application of the model was intended to, and in fact did, demonstrate relative differences in potential job performance. Further, these witnesses testified, and this Court accepts as fact, that the candidates positioned on the register were not, as defendants claimed, equally qualified or a "pool" of qualified candidates.[26]

### The Affirmative Action Plan of the Detroit Police Department

Between late 1973 and mid-1974, Police Chief Philip Tannian[27], as a result of conversations with City of Detroit Mayor-Elect Coleman Young and their joint belief that the Detroit Police Department should be racially reflective of the population of the City of Detroit, committed themselves to the adoption of an affirmative action plan designed to meet this racial balance objective.

On July 1, 1974, the City of Detroit adopted a new City Charter requiring, *inter alia*, the Mayor to appoint a Board of Police Commissioners, hereinafter referred to as BPC. The appointment of the BPC constituted a major change in the structure of the police department as promotions within the department now had to be approved by the BPC after recommendations by the Chief of Police.

The first BPC meeting convened on July 22, 1974. The principal purpose of the meeting was to discuss the adoption of an affirmative action program for the police department. Chief Tannian conducted a presentation before the BPC citing reasons for recommending an affirmative action plan. The foremost reason given by the Chief was alleged prior discrimination against blacks by the department. To support his emphatic claim of historical discrimination regarding the hiring of blacks Tannian cited the work force/general population disparity with regard to blacks on the police force. These statistics, which the Court accepts as correct, showed that blacks comprised only 17% of the total work force of the department while the population of the City of Detroit was 44% black.[28] Tannian also cited performance evaluation ratings and seniority as impediments to minorities in the promotional process.[29] Finally, Tannian cited *Schaefer v. Tannian*, 394 F.Supp. 1128 (E.D.Mich.1974), a suit involving sex discrimination in the Detroit Police Department which, in part, established limited preferential hiring.

As part of the presentation Tannian provided the BPC with a prepared affirmative action resolution declaring that "de facto discrimination" exists in the hiring and promotion of blacks and other minorities in the Detroit Police Department.[30] The resolution further stated that because of past and present discrimination the Chief of Police is required to take immediate affirmative action to eliminate such discrimination by promoting "minorities" from existing promo-

---

**26.** Defendants presented the Court with no evidence, other than bald assertions by Tannian, to support the claim that these candidates were "equally qualified".

**27.** Philip Tannian, originally appointed Police Commissioner under former Mayor Roman Gribbs was reappointed Police Chief by Coleman Young. Young assumed the office of Mayor of the City of Detroit, in January, 1974.

**28.** 1970 Census.

**29.** Statistics reveal that 5% of all Sergeants in 1974 were black. (61/1185).

**30.** The wording "defacto discrimination" apparently was extracted from a legal memorandum submitted by Special Assistant Corporation Counsel for the City and relied upon by Tannian prior to his presentation to the BPC. (exhibit 215).

tional lists. The resolution was not acted upon by the BPC but was instead placed on the agenda of the next meeting.

The BPC reconvened on July 31, 1974. The affirmative action resolution, as provided by Tannian, was read and after the BPC closed a floor discussion [31] the members unanimously adopted the Tannian affirmative action resolution. At this time Tannian requested, and received, approval from the BPC authorizing the first set of out of order promotions from the current Sergeants eligibility register.[32] Tannian cited the affirmative action resolution of the BPC as sufficient reason for the out of order promotions in an attempt to comply with the City Charter.[33] No white males were promoted [34] out of the thirty (30) selected for promotion because the prior thirty (30) promotions had been, with the exception of one, all white. Aware of Mayor Young's campaign promises to racially balance all levels of City government [35] this 50/50 black-white ratio was selected by Tannian because of its correspondence to the present 50/50 black-white ratio of the population of the City of Detroit. From this date to the present all male promotions to the rank of Sergeant were typified by this 50/50 quota.

As stated previously, the BPC relied heavily upon Tannian's work force/general population statistics to show "de facto discrimination" against blacks as reason for adoption of the affirmative action plan. However, the facts in evidence show that no labor market [36] statistics or analysis were presented to the BPC.

The purpose of a labor market analysis, as this Court understands it, is to identify problem areas in terms of underutilization of specific groups or classes. In performing a labor market analysis the first step is to determine the geographical area from which an employer draws its work force, i. e. recruits. Next, the number or percentage of persons in a particular subgroup in the geographical area possessing the minimum requirements for employment is determined.[37] The final step requires a comparison between this figure and the number or percentage of employees in the subgroup employed by the employer.

The evidence in the record reveals, and this Court finds as fact, that since 1968 to the present date, recruiting efforts for applicants to the Detroit Police Department covered a geographical area inclusive of the entire State of Michigan. However, the bulk of all applicants, both black and white, were found in a tri-county area of which the City of Detroit is a part.[38] Until August of 1974 there was no pre-application residency requirement by the City. Prior to that time an applicant need only have been a resident of the State of Michigan for

31. The EEOC in *Baumgart, supra* characterizes this spontaneous discussion as "testimony" in an effort to dignify the same. This is clearly erroneous. The utterances were neither under oath nor investigated by the BPC and were, at best, rank unsubstantiated hearsay.

32. Effective August 1, 1974.

33. The City Charter, § 7–1114, provided that no person eligible for promotion shall be passed over unless the Chief of Police files written reasons acceptable to the BPC. This Court finds, however, that at no time did Tannian file such written reasons to the BPC satisfying this charter requirement.

34. Knowledge of the race and sex of the officers recommended for promotion was achieved by use of a coded eligibility register prepared by Caretti pursuant to Tannian's request.

35. Tannian testified that the Mayor had expressed dissatisfaction with the first 30 promotions because they didn't reflect fulfillment of campaign promises to racially balance all levels of City government.

36. Labor market is generally defined as a subset of the civilian work force as defined by certain geographical boundaries. Civilian work force is a sub-set of the general population, age 16 and above, and includes those currently employed and those looking for employment. Work force is defined as those persons working for an employer.

37. This becomes the relevant labor market.

38. The tri-county area is Wayne, Oakland and Macomb counties. The City of Detroit is located in Wayne County.

one year.[39] The experts have testified, and this Court accepts such testimony as fact, that the proper labor market for comparison in this case is the tri-county area, commonly known as the 1970 Standard Metropolitan Statistical Area (SMSA).[40] The relevant labor market is not the general population of the City of Detroit.[41]

Using the 1970 census and the SMSA as the proper geographical area, application of the second step [42] shows that 18.6% of the relevant labor market was black. This figure, when compared to the 17.23% of blacks on the department in 1974, reveals that blacks were slightly underutilized but not to the degree represented by Tannian and exclaimed by the BPC in the affirmative action resolution as decisive.[43]

Regarding the second factor relied upon by Tannian and accepted by the BPC in adopting the affirmative action resolution, to wit, performance evaluation ratings and seniority, the evidence in this record demonstrates, as this Court has previously found, that neither of these component parts of the promotional process curtailed the promotional opportunity of blacks or in any way discriminated against them. This conclusion could have, indeed should have, been

reached by the BPC had Tannian revealed certain facts he conveniently failed to communicate to the BPC or if the BPC had investigated the truth of the assertions as was their duty. The BPC was not made aware that (1) Caretti's study on service ratings revealed that blacks were not disadvantaged by this component part; (2) Service Ratings were to be reduced in weight in the 1974 model from 30% to 15%; (3) Seniority had been fairly negotiated for and inserted as a contractual provision in collective bargaining agreements since 1968; and (4) Seniority was to be reduced in weight in the 1974 model from 8% to 6%. The most significant failure to fully represent the effect of seniority or service ratings was made by Tannian's failure to produce Caretti before the BPC or at a minimum consult with him regarding these elements prior to the presentation to the BPC.[44] Caretti was, and is, the preparer of the model and each component part and his informed opinion was necessary for a complete and fair analysis of these factors.

Accordingly, the Court finds that service ratings and seniority did not impinge the promotional opportunities as represented by

---

39. In August of 1974 the department adopted a pre-application residency requirement. In order to qualify for consideration subsequent to this date the applicant had to be a resident of Detroit for a minimum of 60 days. After August 1974 the relevant labor market, without knowing whether the applicant changed residence for the purpose of applying, would be the City of Detroit. The residency requirement was enacted because large numbers of white applicants resided outside the City of Detroit. See exhibit 190, pgs. 31–33.

40. The tri-county area, SMSA, was expanded by the Bureau of Census in 1973 to include St. Clair, Lapeer and Livingston counties. The Court, however, rejects the expanded SMSA as being too remote and confines its analysis to the original SMSA as defined.

41. General population statistics are inappropriate because they include persons who are not part of the applicable civilian work force, e.g., those below sixteen and those over sixty-five, those not seeking employment and those employed. Further, they are inappropriate because they include persons who have no attachment to the particular labor market, that

is, those persons not meeting the minimum requirements for the job.

42. The number of blacks, including those missed by certain enumerators, within the civilian labor force of the SMSA who met the age and education requirements of the department. Census figures contain insufficient data to determine whether potential applicants satisfied other application requirements, such as height, weight, vision, criminal record and driving record. See Rosenblum testimony on 12/7/77.

43. Nor to the degree as proclaimed by the EEOC in Baumgart, supra. While proper statistical comparisons are a useful means of evaluating the overall effect of an employer's policies, improper comparisons such as relied upon the EEOC are irrelevant.

44. Additionally, Tannian failed to communicate to the BPC at subsequent meetings certain facts in the Equal Employment Opportunity Plan which the department submitted to the Law Enforcement Assistance Administration. Specifically, the plan represented that neither of these component parts had an adverse effect upon minorities.

Tannian to the BPC. Further, the Court finds that Tannian neglected to paint the full picture in his presentations to the board regarding these factors and that the BPC failed to fulfill their duty to investigate the factual matters as presented by Tannian.

*Schaefer v. Tannian, supra,* was also given as a pivotal reason requiring an affirmative action plan. While the *Schaefer* case legally speaks for itself, the facts of *Schaefer* did not do so in the BPC meetings. In essence, Tannian represented that inasmuch as the department had been found guilty of discrimination against women the same would inevitably hold true for blacks and other minorities. Thus, if sued by blacks the Court would order preferential hiring and promotions. While such logic, from a legal standpoint, is badly flawed a reading of the *Schaefer* case shows that the seminal facts in that case simply did not apply to the action under consideration by the BPC.[45] This Court finds that Tannian, a lawyer and party to the *Schaefer* action, intentionally misrepresented the significance of the decision to the BPC.

Three additional considerations have been relied upon by defendants in either adopting the affirmative action plan or in defense at trial. First, historical discrimination in the Detroit Police Department in hiring and promotion. Second, funding requirements of the Law Enforcement Assistance Administration. Third, the operational needs of the department required employment and promotion of greater number of blacks.

Addressing the factual correctness of the first claim, the evidence in the record shows that since 1968, the point in time when Caretti arrived at personnel, the department has taken many steps to advance black recruitment efforts.[46] The department formed a steering committee on minority recruitment with particular emphasis towards recruitment of black applicants. It designed an "outreach program" relying principally on various advertising techniques to attract qualified black applicants. As part of this program the department sent recruiting vans into areas highly populated by blacks. It initiated several new themes aimed at convincing black men and women that police service provides an excellent opportunity to make meaningful contributions to the community. The department advertised through minority based newspapers and radio stations in an effort to attract greater numbers of blacks. Recruiting posters depicting minority officers were circulated. An officer referral program, primarily directed toward minority officers, was installed in an effort to recruit qualified black applicants. Recruiting efforts were also made at colleges throughout the state with a primary focus on attracting blacks.[47]

In 1971 the department hired a black director of police recruiting. Further, in 1974, the department solicited the support of Mayor Young who responded proclaiming February of 1974 "Minority Recruitment Month" and issued a press release calling upon young minority men and women to give serious consideration to careers in the Detroit Police Department in an attempt to make the department a true reflection of the makeup of the community. A local television station aired two documentaries on the department's minority recruitment efforts. Eventually 85–90% of all field recruiters were black. Additionally, more than 50% of the supervisors and background investigators were members of minority groups.

---

**45.** Among these facts are: (1) discrimination against women applicants was based upon the fact that women were required to have greater education than men; (2) written examinations were given more frequently for men than women; (3) the relief was directed solely to hiring; and (4) the preferential hiring was limited to a single eligibility register.

**46.** This concerted effort was sparked by the July, 1967 Detroit riots.

**47.** These colleges included Michigan State University, Eastern Michigan University, University of Michigan, Oakland County Community College, Oakland University, Wayne State University and Shaw College. It should be noted that this fact reinforces the finding that the SMSA was the proper labor market.

The site of the recruiting section was changed from the headquarters building to several inner-city buildings in predominantly black neighborhoods. Processing procedures, formerly lengthy, were shortened in response to the loss of minorities caused by a loss of motivation. A law enforcement program was instituted in Detroit Public High Schools to attract and prepare blacks for entry into the police profession. Finally, minorities who had previously applied to the department and been rejected were contacted to reapply.

These efforts demonstrate, and this Court finds as fact, that from 1968 to the present date, the department has made every possible effort to attract qualified black applicants for employment in the Detroit Police Department. Indeed, the efforts of the department demonstrate that the department is, to use its own words, the "nation's forerunner in this area." [48]

Defendants presented the BPC and this Court with statistics regarding the number of blacks hired by the police department from 1944 to 1975 which, it is argued, prove past racial discrimination against blacks. After careful review of these statistics [49] the Court finds that these figures do not show such discrimination. In reaching this finding the Court has found that although the statistics show that from 1944 to 1968 the number of whites appointed far outdistanced the number of blacks appointed there is no evidence in the record regarding the number of applicants from each racial group during this period of time. Nor is there evidence showing what the relevant

labor market was during this period of time and the number or percentage of qualified blacks in this market. Without this information the naked numbers of black and white hired is susceptible to a multitude of conclusions.

Further, while the statistics do show a significant difference between the number of black and white applicants and the number of black and white appointees from 1968 to 1975, the data base upon which these figures were derived reveals a multitude of errors in the reporting process seriously impairing any responsible analysis. These applicant flow records are confusing and, in many areas, incomprehensible.[50] Such deficiencies have totally obliterated any statistical verity to be accorded them regarding the percentages of black and white applicants ultimately appointed from 1968 to 1975 [51] and are therefore entitled to, and receive, no weight by this Court.[52]

Much testimony has been adduced regarding the entry level written examination as bearing upon the question of prior discrimination against blacks in hiring. This testimony shows, and the Court so finds, that prior to the 1968 exams, the entrance tests were three to three and one half hours in length and were primarily intelligence quotient oriented. The examinations tended to fail large numbers of blacks in relation to their white counterparts. In 1968, on recommendation of the Vickery Committee,[53] the examination was changed to a 12 minute Wonderlic Examination on the premise that this examination would be an improvement for minorities in terms of

**48.** Equal Employment Opportunity Plan, Exhibit 190, p. 17.

**49.** Exhibits 201, 208, 268, 269.

**50.** Indeed, Commander Thomas Ferrebee, head of recruiting since 1971, testified that he could not explain why sets of numbers that should balance did not. He agreed that he did not understand the reports.

**51.** See Testimony of Marc Rosenblum 12/7/77.

**52.** The EEOC in *Baumgart, supra* relied upon these hiring statistics, as did Tannian and the BPC, in its finding of prior discrimination in the

hiring process. In view of the above mentioned shortcomings inherent in the department's statistics the EEOC's analysis suffers from the same illness as the Tannian analysis and likewise will receive no weight by the Court.

**53.** The Vickery Committee was born in the wake of the 1967 Detroit Riot on recommendations of the Mayor and New Detroit, Inc. Larry Vickery, chairman, was charged with determining why minorities were not succeeding in the application process of the Detroit Police Department.

length of time required by the exam. In practice, the exam continued to pass a high percentage of whites while failing a high percentage of blacks. The Vickery Committee expressed its dissatisfaction and sought out a better examination. Their objective was to find an entry level examination which would be a reasonable predictor of potential job success, free from cultural bias suspected in the present exam. Additionally, the committee desired an exam which would produce equal racial representation on the police force.

In early 1971 the Vickery Committee contacted and hired John Furcon of the University of Chicago to prepare an entry level examination meeting these objectives. Furcon began preparing an entry level examination and in March of 1971 provided the department with an interim test for use until his work was complete. The interim test, known as the "Chicago battery", tested Detroit applicants on the basis of an alleged validated Chicago Police Department entry examination. The exam set different passing scores for black and white Detroit applicants based upon the average passing scores for their Chicago counterparts. These tests were basically I.Q. exams [54] and, while improving the percent of black applicants passing the examination, continued to screen out greater numbers of blacks than whites. The Chicago battery was continued in use until 1973 when the Detroit Furcon exams were completed.

The Detroit Furcon Exams were scored by use of differential regression equations. Use of differential regression equations rests upon the assumption that the use of either differing tests or the application of varying weights to the same questions can measure one standard of job performance. With the advent of the Detroit Furcon examinations black and white applicants passed at approximately the same rate.

The defendants claimed at trial, as well as representing to the LEAA in their Equal Employment Opportunity Plan, that the Furcon exam for Detroit had been validated. However, at trial neither Furcon nor a validation report was produced. Contrary to this assertion of validity, the expert testimony in the record shows, and this Court finds as fact, that the Furcon examination was not a job related exam and resulted in random hiring as opposed to hiring the most qualified.[55] No contrary evidence was presented regarding this finding. Accordingly, the Court finds from the foregoing facts that the department's primary concern was not in attempting to determine who were the best suited for employment with the department. Rather, the concern was to racially have the police department reflect the composition of the population of the City of Detroit.[56]

The final form of hiring discrimination evidence was received from individual black police officers regarding their prior departmental experiences.[57] A review of their entire testimony shows that all but one of those applicants were rejected, if at all, for proper non-racial reasons. The one exception is Rodney Brown. Brown originally applied in 1963 and was rejected on the basis of being too short.[58] The minimum height requirement at that time was 5'8½" and Brown stood 5'11". This fact shows an improper rejection but in and of itself does

---

54. A combination of Wonderlic and Otis exams occasionally augmented by a pictorial reasoning test.

55. The experts agreed that because the entry exams were not job related, deficiencies in a group's performance on the promotional exams may well be explained by the randomness of the entrance exams. In other words, the job related promotional exam reveals potential for upward mobility while the entry exam did not.

56. Supportive of this fact is Ferrebee's testimony that in effect there are three eligibility entry registers: white male, black male and female.

The manner of selection, excluding females, consists of selecting all eligible black males and, if there are insufficient applicants to fill existing openings, fill the remainder with white males.

57. Moses Baldwin, Jessie Stewart, Clifton Donaldson, Maurice Cochran, Bruce Ford, Rodney Brown and Ralph Wallace.

58. Mr. Brown subsequently applied to the Detroit Police Department in 1972 and was thereafter appointed in August of that year.

not show racial discrimination. There is no testimony showing that the rejection was anything but a wrongful one. It has not been shown that the person measuring Mr. Brown was white. Nor has it been shown that white males, shorter than 5'8½" were accepted either before or after Mr. Brown's rejection. One isolated incident occurring 15 years ago does not demonstrate that there was a practice of improperly rejecting blacks on the basis of the height requirement. The Court cannot find that Mr. Brown was rejected because of his race but can only find the rejection to have been improper.

Defendants have also claimed that discrimination against blacks existed in the department's past promotional practices.[59] No evidence has been produced regarding promotional models antedating 1973. If evidence of racial discrimination, either overt or covert, existed in these models it should have been produced by the defendants. In view of the fact that it was not, the Court can only conclude, as fact, that prior promotional models and their application were not discriminatory against blacks, whites or any other class of individuals.

In summation, the evidence reveals, and this Court finds as fact, that until 1973 entry level (hiring) written examinations of the Detroit Police Department may have constituted a source of discrimination against blacks seeking entry into the department because these examinations were heavily weighted on I.Q. type questions, were not job related and tended to fail large numbers of blacks vis a vis whites. However, the evidence also shows that after installation of the Detroit Furcon exams in 1973, no discrimination of any form existed in regard to black applicants for positions as police officers.[60] Further, this

Court finds that the application of promotional models existing prior to 1973 did not discriminate in any fashion against black police officers.

In defense of its affirmative action plan the defendants have claimed that the Detroit Police Department was required to adopt such a plan or risk the threat of loss of federal funds from the Law Enforcement Assistance Administration (LEAA).[61] The evidence in the record reveals, and this Court finds as fact, that in 1974 the LEAA conducted audits of the department's employment practices. Upon conclusion of the audits the LEAA required the department to submit a written program merely documenting their current practices in order to continue receipt of grants. The department, however, had never received any complaints from the LEAA that its pre-affirmative action hiring or promotional policies or practices were discriminatory against any group. Nor had the department ever been threatened with a revocation of funds for lack of an affirmative action plan. Funds were threatened to be cut off, if at all, for the sole reason of failing to submit a written program documenting the department's current employment practices. The deadline for filing was December 31, 1975.

In July of 1975 Tannian directed Jacqueline DeYoung to prepare the required plan.[62] Ms. DeYoung familiarized herself with a Equal Employment Opportunity Program Development Manual prior to preparation of the plan and attempted to comply with the manual's directives.

The plan as submitted on December 31, 1975 was approved by the LEAA in 1976. The EEOP submitted by the department makes many statistical comparisons between the work force of the department

---

**59.** The 1973–1976 promotional models have been discussed by the Court previously and have been found to be content valid, free of cultural bias and and racial discrimination.

**60.** At this point in time blacks and whites were passing the entry examinations at approximately the same rate.

**61.** The Detroit Police Department has, both before and after the adoption of the affirmative action plan, received grants from the LEAA which were used, in part, to pay salaries of police officers and Sergeants.

**62.** DeYoung was employed with the department and participated in the audits conducted by LEAA.

and the general population of the City of Detroit.[63] Tannian directed DeYoung to use general population statistics despite her insistence that such comparisons were improper.

While the department's EEOP represented that the Detroit Police Department provides equal employment opportunity for all employees it concealed much of what was the actual present practice of the department regarding promotions to the rank of Sergeant. The plan represented that "adjustments" from the eligibility register were necessitated in order to facilitate the attainment of affirmative action objectives and that promotions to the rank of Sergeant have been made "in a manner that assures that appropriate proportions of minorities and female officers are selected."[64] The plan, however, does not inform the LEAA that the "adjustments" and "manner" referred to are actually made by intentionally passing over white males who have achieved a higher position under a content valid promotional model in order that equal numbers of black males may be promoted. The plan does not inform the LEAA that "appropriate proportions" means that of a 50% quota. The most incredible misrepresentation of the plan is its consistent use of the word "minorities". The affirmative action plan of the department did not apply to the broad spectrum of minorities. It applied to blacks and blacks alone. The department did not reveal that it deemed American Indians, Chinese, Japanese, Mexican, Spanish, Latinos, Whites and all other racial and ethnic groups to constitute the majority. Also omitted from the EEOP is the fact that the department had instituted an appeal procedure, as of right, for those officers passed over for promotion under the guise of the affirmative action plan. The reason for the omission is obvious. The evidence shows that in order to appeal an officer had to state facts sufficient to prove the following. First, that the appealing officer was on the eligibility register and an officer in a lower position was promoted. Second, the action was not based on the affirmative action policy as adopted by the BPC. Thus, inasmuch as the evidence clearly shows that no officer was passed over for a reason *other than* the affirmative action plan, the so-called "right of appeal" was non-existent. The evidence shows that all appeals were perfunctorily denied because the appealing officers could not allege the jurisdictional facts required to perfect an appeal. Not only did the required jurisdictional facts render the appeal a nullity, they constituted a violation of the City Charter which granted a right of appeal.[65] Omission of the appeal process from the written EEOP is quite understandable in view of these facts since upon revelation it would have exposed the actual promotion system thereby self-indicting the appeal process.

In conclusion, this Court finds that the department did not institute the affirmative action plan because of a threat of loss of federal funds flowing from the LEAA. On the contrary, once the LEAA required a written plan the department attempted to mask and conceal from the LEAA actual departmental practices with regard to promotions.

As a final consideration in defense of the affirmative action plan the defendants stand upon the amorphous claim of "operational needs". Stripped to its barest form this argument rests upon the premise that blacks can communicate and cooperate better with blacks than can whites. Thus, since the City of Detroit is largely black greater numbers of blacks in all ranks of the police force will tend to enhance communication and cooperation with the community, install greater respect for the department, reduce and solve crime, and in general, improve the overall effectiveness of the department.

As proof of the foregoing belief defendants rely principally upon an alleged reduction of crime and a drop in citizen com-

---

63. The statistics were the same comparisons as those submitted by Tannian to the BPC in 1974.

64. Exhibit 190, pgs. 7–8.

65. Detroit City Charter, § 7–1114.

plaints. On the whole, the evidence in the record reveals, and this Court finds to be fact, that neither the quantity of crime nor the number of citizen complaints dropped with the advent of the department's affirmative action plan. More importantly, however, is the fact that there is no evidence in the record indicating that if such a decrease in crime and citizen complaints did exist that the decreases were attributable to the affirmative action plan.

Diametrically opposed to the void of competent evidence concerning the claim that the affirmative action plan improved the overall effectiveness of the department is evidence,[66] which the Court accepts as fact, that the inclusion of race as a promotional criterion damages departmental morale and the quality of work of all officers. The record evidence demonstrates, which the Court accepts as fact, that a police officer's effectiveness, as a professional law enforcement officer both within the department

and the community in which he serves, is dependent upon his education, skill, training, attitude and sense of professionalism. The unalterable pigmentation of his skin has no bearing upon these facts and neither enhances nor depreciates his professional enforcement effectiveness. Defendants' claim that operational needs of the department required more blacks on the police force is rejected by the Court as being factually unsupported by any competent evidence.

## CONCLUSIONS OF LAW [67]

### *Title VII* [68]

The complainant in any Title VII action, 42 U.S.C. § 2000e, *et seq.*, must, at the outset, carry the initial burden under the statute of establishing a prima facie case of racial discrimination. As the United States Supreme Court stated in *McDon-*

---

**66.** Testimony of Dr. Ebel, Dr. Wollack and Dr. Beckman.

**67.** In assembling the Findings of Fact and Conclusions of Law the Court has placed no weight on the EEOC determination of no reasonable cause in this case. *Baumgart, et al. v. Detroit Police Department, et al.,* Charge No. TDT5–0067, TDT6–1070, TDT6–1071, 12/8/77. The reasons for this evaluation is two-fold. First, the pivotal facts as revealed by the EEOC investigation are contrary to the evidence in the record as shown by the Court's Findings of Fact. Specifically, the EEOC erroneously states that: (1) the "relevant background facts are not in dispute" (p. 2); (2) "All forty-one (41) candidates were white males" (p. 2); (3) "The all-white selection for supervisory positions was typical of the racial pattern of past selections" (p. 2); (4) "Testimony was taken at public hearings" (p. 3); (5) only "the top 100 slots actually had a reasonable expectation of being promoted" (p. 12); (6) the defendants' numerical promotion ratio is "temporary" and justified by the use of "unvalidated promotional tests" (p. 16); (7) the eligibility registers were "unlawfully derived" (p. 16); (8) the "selection process did not necessarily identify the most qualified candidates for promotion" (p. 20); and (9) the officers on the eligibility register represent a "pool" of highly qualified candidates (p. 20). All these statements find not a scintilla of supporting evidence in the record and are clearly erroneous.

The second reason requiring the Court to ignore the EEOC determination is its interpretation of employment discrimination law. Spe-

cifically, "a reasonable belief that discrimination has occurred" (pgs. 5–6) will not justify a quota. 42 U.S.C. § 2000e–5(e). The proper role of statistics does not lie in the comparison between the employer's workforce and general population. (Pgs. 6–7) *Hazelwood, infra.* A legitimate seniority system is not unlawful simply because it may perpetuate pre-Act discrimination. (p. 11) *Teamsters, infra.*

A shoddy background investigation can explain gross factual errors but does not provide a reason for the selective reading of legal authorities. On the final day of a four month trial, after this charge had been with the EEOC for over forty months, the EEOC's decision is produced and proffered as an exhibit. Over plaintiffs' vehement objection on grounds of unfair surprise, the Court accepted it. The Court should have refused its admission, not on grounds of prejudice, but on grounds of relevance. The decision is probative of nothing—except the fact that the Commission is fond of utilizing the courts to establish theories which have been previously rejected by the United States Supreme Court.

**68.** The plaintiffs have exhausted their administrative remedies as required by 42 U.S.C. § 2000e–5(b)–(f). *McDonnell, Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876 (8th Cir. 1977). The Court, therefore, has jurisdiction to determine the Title VII claims of plaintiffs.

*nell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> "This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[13]" (footnote omitted)

■ Subsequent to the *McDonnell Douglas* decision the Supreme Court unequivocally dispelled the notion that Title VII only applied to non-whites holding that Title VII prohibits racial discrimination against whites in the same fashion as it prohibits racial discrimination against any protected group.[69] *McDonald v. Sante Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Haber v. Klassen,* 540 F.2d 220 (6th Cir. 1976); *Herrman v. Coleman,* 428 F.Supp. 447 (D.C.D.C.1977).

■ Inasmuch as the *McDonnell Douglas* decision involved a refusal to hire and the instant case centers around a refusal to promote, the prima facie proof required, although similar, is somewhat differing. A prima facie case of failing to promote because of racial discrimination is made by showing (i) that plaintiffs belong to a protected class or group; (ii) that they were qualified for promotion and might have reasonably expected selection for promotions under the defendant's on-going competitive promotion system; (iii) that they were not promoted; and (iv) the supervisory level employees having responsibility to exercise judgment under the promotion system betrayed in other matters a predisposition towards discrimination against the members of the protected group. *Pettit v. United States,* 488 F.2d 1026, 1033, 203 Ct.Cl. 207 (1973); *Thompson v. McDonnell Douglas Corp.,* 416 F.Supp. 972, 980 (E.D.Mo.1976).

■ Additionally, the class action plaintiffs ultimately had to prove more than the mere occurrence of isolated, accidental or sporadic discriminatory acts because they have alleged a pattern or practice of racial discrimination in the area of promotions contrary to Title VII. Plaintiffs had to establish by a preponderance of the evidence that racial discrimination was the defendants' standard operating procedure—the regular rather than the unusual practice. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

■ The Court's Finding of Fact unequivocally establish that both plaintiffs have proven the four elements of a prima facie case of racial discrimination regarding the defendants' usual practice of promotions to the rank of Sergeant. The plaintiffs are members of a protected class. *McDonald v. Sante Fe Trail Transportation Co., supra; Haber v. Klassen, supra.* They were better qualified than those officers promoted who stood lower on the eligibility register and but for the defendants' affirmative action plan would have been promoted. They were not timely promoted. Finally, defendants' operation of the affirmative action plan evinced a predisposition towards discrimination against whites.

■ The burden may be deemed shifted to defendants to articulate, as to each passover of plaintiffs, where they might have been selected, that the non-selections were for legitimate non-discriminatory reasons. *McDonnell Douglas Corp. v. Green, supra.*

■ In enacting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* Congress did not intend to guarantee a job or promotion to every person regardless of qualifications. The Act does not command that any person be hired or promoted simply because he was formerly the subject of discrimination. Discriminatory preference for any group is precisely and only what Congress has proscribed. Thus, Congress has required employers to remove artificial, arbitrary and unnecessary barriers

---

**69.** The same conclusion was reached by the Court in interpreting 42 U.S.C. § 1981.

to employment when such barriers operate to discriminate on the basis of race or other impermissible classification. *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *McDonnell Douglas Corp. v. Green, supra; McDonald v. Sante Fe Trail Transportation Co., supra.*

Section 703(a) of Title VII, 42 U.S.C. 2000e–2(a) specifically provides:

"Section 703(a); It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin."

■ It is clear from the evidence in the record, as found by the Court's Findings of Fact, that defendants have, since August of 1974, continually and repeatedly violated Section 703(a) by granting preferential treatment to blacks on the sole basis of their race thereby discriminating against all others.

In an attempt to avoid the express prohibition of Section 703(a) defendants seek to justify the racially discriminatory effects of their quota system by relying upon the desire to racially balance the police department with the population mix of the City of Detroit.

Section 703(j) of Title VII, 42 U.S.C. § 2000e–2(j), provides, in pertinent part, as follows:

"Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race, color, religion, sex or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex or national origin employed by an employer, . . . in comparison with the total number or percentage of persons of such race, color, religion, sex or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

■ Notwithstanding the clear prohibition of the statute, a review of the legislative history of the Civil Rights Act of 1964 demonstrates that Congress was totally aware of affirmative action programs when it enacted Section 703(j) and consistently expressed the intention that any deliberate attempt to maintain racial balance by consideration of an employee's race would violate Sections 703(a) and 703(j). By enacting Section 703(j) Congress recognized, and rejected, the notion that racial groups were entitled to proportional representation in all occupations. Simply put, Section 703(j) requires rejection of defendants' contention that racial balancing is a legitimate non-discriminatory reason for the non-selection of the white police officers. *Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216 (5th Cir. 1977); *Cramer v. Virginia Commonwealth University,* 415 F.Supp. 673, 678–679 (E.D.Va.1976).

■ Defendants further seek to justify the affirmative action plan designed to racially balance the police force on the ground that "operational needs" of the department required greater numbers of blacks. Notwithstanding the fact that the Court has found no factual basis for this belief, Title VII would clearly render such a defense void as a matter of law. Specifically, Section 703(e), 42 U.S.C. § 2000e–2(e), provides in pertinent part as follows:

"Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion, sex, or national origin in those certain instances where

religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . "

Noticeably absent from Section 703(e) is the inclusion of race or color as bona fide occupational qualifications. After careful review and consideration of the legislative history of this section the Court must conclude that the omission of race and color as bona fide occupational qualifications was an intentional one and that Congress did not view race as a qualification which could, in the proper factual context, be considered reasonably necessary to the normal operation of any business or enterprise. The legislature has, by the terms of Section 703(e), sanctioned a limited customer preference exception in the areas of religion, sex and national origin but has refused to do so in the areas of race or color. *Diaz v. Pan Am World Airways, Inc.*, 311 F.Supp. 559, 569 (S.D.Fla.1970), *rev'd on other grounds*, 442 F.2d 385 (5 Cir.) *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

Prior racial discrimination in hiring and promotion has been the crux of the defense of the affirmative action plan of the Detroit Police Department. During the course of trial defendants' presentation of proof of such discrimination was largely, if not totally, statistical. Although the Court in its Findings of Fact rejected the majority of the hiring statistical evidence for the factual reasons stated therein, there are a number of legal principles further requiring the rejection of defendants' statistics which, it is argued, constitute past legal discrimination against blacks in violation of Title VII.[70]

No doubt can exist that in employment discrimination cases the Supreme Court has sanctioned the use of statistics by a plaintiff in order to establish a prima facie case of racial discrimination. *Griggs v. Duke Power Co., supra; Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *International Brotherhood of Teamsters v. United States, supra; Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The logic behind such an allowance is based upon acceptance of the fact that in many cases individual employees are incapable of compiling concrete evidence of specific acts of discrimination or discriminatory employment policies. As stated by the Sixth Circuit Court of Appeals in *Senter v. General Motors Corp.*, 532 F.2d 511, 527 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976):

> "An employee is at an inherent disadvantage in gathering hard evidence of employment discrimination, particularly when the discrimination is plant-wide in scope. It is for this reason that we generally acknowledge the value of statistical evidence in establishing a *prima facie* case of discrimination under Title VII."

Whether or not an *employer*, in adoption of a so called "affirmative action" plan, can rely solely upon statistical comparisons in an effort to prove prior discrimination in its employment practices appears to be highly questionable since the logic for allowance of such statistics would not apply. If an employer has discriminated against a group, intentionally or otherwise, the employer is the party in the best position to be able to produce concrete evidence of its prior discrimination. Normally, if an employee produces evidence of a statistical disparity the burden of explanation would shift to the employer. However, to require an employee, who charges the employer with discrimination against him, to refute the employer's reliance on statistical comparisons is an onerous burden which should not befall the employee. He is not in control of the evidence and has, as the discovery process in this case reveals, no reasonable means of gaining access to the alleged evidence.

70. The same evidence is claimed by defendants to demonstrate that past discrimination against blacks also violated the constitutional rights of blacks. This claim is discussed, *infra*, under the constitutional analysis.

However, even if the employee must shoulder this burden it does not arise until the employer has produced the proper statistical comparisons as statistics come in infinite variety and, like any other evidence, they may be rebutted. *International Brotherhood of Teamsters v. United States, supra; Hazelwood School District v. United States, supra.*

In *Hazelwood* the Supreme Court discussed the proper role of statistics and statistical comparisons in an employment discrimination case grounded upon Title VII. The Court held that when special qualifications are required to fill particular jobs, comparisons to the general population, rather than to the smaller group of individuals who possess the necessary qualifications, may have little probative value. By contrast, the Court stated that the proper statistical comparison is between the composition of the employer's work force and the racial composition of those meeting the special qualifications in the relevant labor market. 433 U.S. at 308, 97 S.Ct. 2736.

Application of proper statistics pursuant to the dictates of *Hazelwood* demonstrate that in 1974, the point in time of the adoption of the affirmative action plan, the Detroit Police Department was 17.23% black. By comparison, 18.6% of those meeting the special qualifications in the relevant labor market were black.[71]

■ The Department of Justice has issued Equal Employment Opportunity Guidelines which determine the significance of these figures. 28 C.F.R. § 42.301 *et seq.* These guidelines, although not enacted by the body having enforcement responsibility under Title VII, should be entitled to great

deference.[72] *See, Griggs v. Duke Power Co., supra* 401 U.S. at 433–434, 91 S.Ct. 849.

28 C.F.R. § 42.306(c) provides:

"(c) A significant disparity between minority representation in the service population and the minority representation in the agency workforce may be deemed to exist if the percentage of a minority group in the employment of the agency is not at least seventy (70) percent of the percentage of that minority in the service population." [73]

Application of § 42.306(c) to the foregoing percentages demonstrates that there was no "significant disparity" regarding black representation on the Detroit Police Department.[74]

■ However, even if there had been substantial difference with regard to proper statistical comparisons where the employer is a public one consideration must be given to employment practices after March 24, 1972. As the *Hazelwood* Court stated:

"Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes.[15]" (footnote omitted) 433 U.S. at 309, 97 S.Ct. at 2742.

Thus, notwithstanding the fact that at the point in time of the adoption of the affirmative action plan there was no significant disparity according to the Department of Justice, statistics regarding pass/fail rates on the entry examination antedating March 24, 1972 are inconsequential in deter-

**71.** 1970 census.

**72.** The Department of Justice does, however, have enforcement responsibility under Title VI, 42 U.S.C. § 2000d. *See* 28 C.F.R. § 42.101 *et seq.*

**73.** On February 16, 1977 the Department of Justice amended 28 C.F.R. § 42.206(b)(1) by substituting the term "relevant labor market" for the term "service population". Additionally, § 42.302(f) and the first sentence of § 42.-306(b) of 28 C.F.R. § 42.301 *et seq.* were delet-

ed. Accordingly, while the terms were not formally changed in § 42.306(c), the Court is quite confident that the intent of the Department of Justice was to require the employer's workforce to be compared with the relevant labor market and not the service population as formerly defined. Therefore, the Court will apply such a construction. *See* 42 FR 9492–9503 (1977).

**74.** $18.6 \times 70\% = 13.20\%$.

mining if there had been a prior Title VII violation.[75] Further, as the Findings of Fact demonstrate, shortly after March 24, 1972, there was no disparate impact upon blacks as a result of entry examinations or any other portion of the entry process.

In the promotional model the Court's Findings of Fact reveal that the pass rate on the written examination in 1973, 1974 and 1976 for black males vis a vis white males was 65.1%, 73.2% and 82.3%, respectively. Defendants rely upon these figures to demonstrate disparate impact in the written examinations and therefore prima facie discrimination violative of Title VII.

The Office of Federal Contract Compliance Programs, Department of Labor, has issued guidelines, which the Court adopts, for the purpose of determining the significance of these figures.[76] 41 C.F.R. § 60–3.1 et seq. Notwithstanding the fact that these guidelines, like those of the Department of Justice, have not been specifically adopted by the EEOC as protector under Title VII the Court will accord them due deference.

41 C.F.R. § 60–3.4(b) provides as follows:

"A selection rate for any racial, ethnic or sex group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded as evidence of adverse impact. Smaller differences in selection rate may nevertheless be considered to constitute adverse impact, where they are significant in both statistical and practical terms. Greater differences in selection rate would not necessarily be regarded as constituting adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group."

■ By the terms of the foregoing guideline the 1973 and 1974 written promotional examinations had an adverse impact upon blacks while the 1976 examination did not. Adverse impact is considered by these guidelines to be discriminatory. 41 C.F.R. § 60–3.3(a); See 29 C.F.R. § 1607.3. However, adverse impact does not mandate a conclusion of discrimination if the procedure is validated in accordance with Equal Employment Opportunity Guidelines on Employee Selection Procedures and alternative suitable procedures do not exist. 29 C.F.R. § 1607.3; See 41 C.F.R. § 60–3.3(b), (c). Thus, it must be shown that the examinations have a manifest relationship to the job in question, that is, job related. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co., supra* ; 29 C.F.R. § 1607.-4(c); 41 C.F.R. § 60.3.12(c); See 42 U.S.C. § 2000e–2(h).

■ Validity of a written examination can be demonstrated by three basic methods: "empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and criteria so identified); "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content validity" (demonstrated by tests whose content closely approximate tasks to be performed on the job by the applicant). *Washington v. Davis, supra*, 426 U.S. at 247, 96 S.Ct. 2040.

In the instant case the Findings of Fact of the Court, as shown by the overwhelming evidence, compel the conclusion that the

---

**75.** Of course, a public employer even before the extension of Title VII in 1972 was subject to the command of the Fourteenth Amendment not to engage in purposeful racial discrimination. *Hazelwood School District v. United States*, at 309, footnote 15, 97 S.Ct. 2736.

**76.** These guidelines are substantially the same as those of the EEOC. *See* 29 C.F.R. § 1607.1 et seq.

1973, 1974 and 1976 written promotional examinations were content valid.[77] 29 C.F.R. 1607.5; 41 C.F.R. 60–3.12(c). Further, the defendants have not shown that other tests or selection devices, without the adverse impact, would serve the employer's legitimate interest in efficient and trustworthy workmanship. Conversely, the plaintiffs' experts testified that suitable alternatives did not exist. *McDonnell Douglas Corp. v. Green, supra* 411 U.S. at 801, 93 S.Ct. 1817; *Albemarle Paper Co. v. Moody, supra* 422 U.S. at 425, 95 S.Ct. 2362.

■ Although the defendants have shown that the 1973–1974 written promotional examinations had a slight adverse racial impact upon blacks, the plaintiffs have satisfied their burden of showing that these examinations were content valid. Defendants having failed to rebut this fact or the fact that no suitable alternative existed without a similarly undesirable racial effect, the Court is bound, as a matter of law, to conclude that no discrimination existed in this area of the promotional models for 1973, 1974 or 1976.

No statistics were presented to the Court regarding the pass/fail ratios on promotional examinations prior to 1973. However, even if such statistics were available and presented such statistics, assuming an adverse impact against blacks by the terms of the guidelines, would not establish a violation of Title VII as the public employer did not become bound by Title VII until March 24, 1972. *Hazelwood School District v. United States, supra.*

The seniority component of the promotional model has been attacked by the defendants as a source of prior discrimination against blacks seeking positions as Sergeants.

Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) provides in part:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin . . .".

■ In *International Brotherhood of Teamsters v. United States, supra,* the Supreme Court, in addressing § 703(h), held that although a seniority system tends to perpetuate the effects of pre-Act discrimination resulting in one group having greater seniority than another, Title VII does not outlaw, destroy or water down an otherwise neutral, legitimate seniority system or the vested seniority rights attendant thereto simply because the employer had engaged in discriminatory hiring or promotion prior to the passage of the Act. *Accord, United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

■ As in *Teamsters,* the seniority system and the weight accorded it in the 1973–1976 promotional models is entirely bona fide. It applies equally to all races and has been negotiated for at arm's length between able parties. Most crucial, there is not a scintilla of evidence showing maintenance of such a system on the pretext of

---

**77.** The Findings of Fact as shown by the evidence clearly indicate that the examinations were well developed tests consisting of suitable samples of the essential knowledge, skills or behaviors composing the job in question. 29 C.F.R. § 1607.5(a). The exams did not test types of knowledge, skills or behaviors which could be acquired in a brief orientation to the job. 29 C.R.R. § 1607.5(a). The tests were administered and scored under controlled and standardized conditions with proper safeguards to protect the security of test scores. 29 C.F.R. § 1607.5(b)(2). The work behaviors which the tests were intended to predict or identify were fully described. Moreover, the examinations represented and tested major or critical work behaviors as revealed by careful job analyses. 29 C.F.R. § 1607.5(3). The exams were patterned after procedures described in "Standards for Educational and Psychological Tests and Manuals" published by the American Psychological Association. Higher scores were expected to result in better job performance. 41 C.F.R. § 60–3.12(c)(2). The exams were representative samples of the performance domain of the job. 41 C.F.R. § 60–3.12(c)(3).

discrimination or any other unlawful purpose. In light of the Supreme Court's interpretation of § 703(h) and the fact that the instant seniority system is entirely bona fide, the Court holds, as a matter of law, that the seniority portion of the promotional model is immune from attack and cannot be said to constitute a form of discrimination against blacks prohibited by Title VII.

Service, or performance evaluation, ratings were also claimed to have discriminated against blacks. As factually found by the Court the statistical and testimonial evidence in the record demonstrates that service ratings did not impinge, discriminate or have any disparate impact against blacks. However, notwithstanding the inherent subjective nature of service ratings such evaluation tools are approved by the EEOC guidelines.

> 29 C.F.R. § 1607.5(b)(3) provides in part: " . . . [I]n the case of rating techniques, the appraisal form(s) and instructions to the rater(s) must be included as part of the validation evidence. Such criteria may include measures other than actual work proficiency, such as training time, supervisory ratings, regularity of attendance and tenure. Whatever criteria are used they must represent major or critical work behaviors as revealed by careful job analyses."

The Findings of Fact clearly demonstrate, and the Court must conclude, that service ratings have been installed in compliance with this guideline. Prior discrimination simply did not exist in the service rating component. *United States v. City of Chicago*, 411 F.Supp. 218 (N.D.Ill.1976), *aff'd in pertinent part*, 549 F.2d 415 (7th Cir. 1977); *Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972 (E.D.Mo.1976); *Frink v. United States Navy*, F.Supp. (E.D. Pa.1977); 16 F.E.P. Cases 67 (1977).

The educational, veteran's preference and oral board factors were not claimed by the defendants to be discriminatory against blacks.[78] Therefore, the Court concludes, as

a matter of law, that no remaining component parts of the promotional models, either before or after the effective date of Title VII, constituted an unlawful barrier for blacks in the promotional process to the rank of Sergeant.

▮ In the absence of proof of prior discrimination as claimed by the defendants the preferential promotion plan of the defendants clearly violates Title VII as an impermissible racial quota. 42 U.S.C. § 2000e–2(a), (j). This conclusion would persist even if the instant plan had been judicially mandated since as a precondition to quota type relief under the Act prior unlawful discrimination must be found to exist. Specifically, Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), provides, in part, as follows:

> "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate . . . or *any other equitable relief as the court deems appropriate* . . . ."

▮ A clear reading of Section 706(g) and the legislative history of the Act indicates that the section presupposes a finding of unlawful discrimination and that so-called "affirmative action" is a fluid equitable remedy always requiring, at a minimum, the cessation of employment practices and procedures which discriminate and the creation of employment policies designed to achieve equal opportunity for all. Section 706(g) may, in the proper case, allow the Court to impose quota type relief. *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977); *EEOC v. American Telephone & Telegraph Co.*, 556 F.2d 167 (3rd Cir. 1977). Prior racial discrimination against blacks being absent in this case, the

---

**78.** Oral boards, as the Court has found, favored blacks. Veteran's preference is protected by Title VII. 42 U.S.C. § 2000e–11; *Common-*

*wealth of Massachusetts v. Feeney*, 429 U.S. 66, 97 S.Ct. 345, 50 L.Ed.2d 224 (1977).

Court holds as a matter of law that Section 706(g) would not allow *any* quota regardless of whether it was voluntary or court ordered. To do so would be to install a remedy where there has been no wrong.

■ However, even if there had been proof of prior discrimination against blacks, Section 706(g) does not grant the employer, acting alone, the prerogative of fashioning quota type relief. This conclusion is based upon several observations. First, the prohibition of Section 703(a) of Title VII is directed solely to employers and not to the courts. Second, Section 706(g) directs that the courts are empowered to fashion remedies for violations of Section 703(a) and does not grant the same authority to the employer. To be sure voluntary compliance in eliminating unfair labor practices is the central theme of Title VII and is preferable to court action. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). However, installation of remedies designed to correct past unfair labor practices which discriminate against certain racial groups is a far cry from the equitable relief intended by Section 706(g). While Congress recognized that remedies must be fashioned to correct prior discriminatory practices and to cure the ill effects of past discrimination, it was cognizant of the fact that courts alone are in a position to afford due process to all concerned in determining the necessity for and in fashioning such relief. *Reeves v. Eaves*, 411 F.Supp. 531 (N.D.Ga.1976); *Chmill v. City of Pittsburgh*, 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977). *Compare*, Michigan Compiled Laws Annotated 37.2210. All will agree that relief in the nature of a quota is extreme and should be approached and imposed only with utmost care and caution in order that such extraordinary relief will be uniform and in existence only so long as is necessary to achieve the intended purpose.[79] An employer who readily admits it has discriminated in its employment practices in the past, intentionally or otherwise, can hardly be placed in a position of trust and confidence on a plateau with the courts who, without the stigma of the prior impermissible action, sit unblemished in fashioning relief for such prior discrimination. The reasoning that unless an employer can fashion quota type relief the voluntary compliance theme of Title VII will be subverted is particularly naive. Voluntary quota relief by an employer, as this case evidences, merely changes the racial makeup of the plaintiff class. Accordingly, the Court holds, as a matter of law, that quota relief, when fashioned by the employer without the assistance and direction of the court, is not permitted and runs afoul of Section 706(g) of Title VII.

There is another compelling reason why the instant promotional quota, even if it had been judicially imposed, could not withstand a Title VII assault. In *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333 (2nd Cir. 1973); *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975), the Second Circuit sanctioned the use of hiring quotas in a police department where the evidence had shown prior discrimination in hiring. However, the Court reversed the district court's establishment of a promotional quota where the evidence had shown discrimination to be absent. Speaking for the Court, Judge Mulligan stated the *ratio decidendi* as follows:

" . . . While past exclusionary hiring examinations do justify the quota remedy on entrance, there is no justification in our view for extending the remedy to higher ranks. We are discussing some 117 positions with time-in-grade requirements mandating three years' service as a patrolman, sergeant and lieutenant postponing promotion to captain for a minimum of nine years. While this factor will delay those of the minority groups who will become patrolman, the imposition of quotas will obviously dis-

---

**79.** The defendants' plan lacked both these features. First, no consideration was given to whether groups *other than blacks* had been discriminated against in the past. Second, evidence in the record demonstrates that the plan was not temporary and terminable at a definite point in time.

criminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate, rather than diminish racial attitudes. (citations omitted). Police morale is again a proper concern if the welfare of the whole community is to be considered. We see no purpose in curing a past mischief by imposing a new one which is deliberately tainted . . . ." *id.* at 1341.

Further explaining their rejection of promotion quotas, the Second Circuit in *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420 (2nd Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), refused to order a promotional quota to the position of correction sergeant in the New York State Department of Correctional Services, notwithstanding the fact that the former promotional exam was found to be discriminatory.

In so holding the Court stated:

"A hiring quota deals with the public at large, none of whose members can be identified individually in advance. A quota placed upon a small number of readily identifiable candidates for promotion is an entirely different matter. Both these men and the court know in advance that regardless of their qualifications and standing in a competitive examination, some of them may be passed for advancement solely because they are white . . ." *id.* at 429.

Consistent with its prior decisions in *Kirkland* and *Bridgeport Guardians,* the Second Circuit in *Chance v. Board of Examiners,* 534 F.2d 993 (2nd Cir. 1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), refused a formula imposing a racial quota upon certain "excessing" procedures because of its effect upon small numbers of readily identifiable individuals. The Court stated:

"Moreover, the concern which we expressed in *Kirkland v. New York State Department of Correctional Services,* 520

F.2d 420 (2nd Cir. 1975), about the 'bumping' effect of a quota 'upon a small number of readily identifiable' individuals finds equal cause for expression in the situation which now confronts us. We are advised that in some of the school districts employees will be excessed from groups containing as few as two or three persons. To require a senior, experienced white member of such a group to stand aside and forego the seniority benefits guaranteed him by the New York Education Law and his union contract, solely because a younger, less experienced member is Black, or Puerto Rican is constitutionally forbidden reverse discrimination." (footnote and citation omitted) *id.* at 998–999.

This Court agrees with, and adopts, the Second Circuit's observation that entry level quotas have a diffuse and less ascertainable effect than a quota used to hinder the promotional opportunities of readily identifiable members of the employer's work force. *White v. Carolina Paperboard Corp.,* 564 F.2d 1073 (4th Cir. 1977); *Lige v. Town of Montclair,* 72 N.J. 5, 367 A.2d 833 (1976); *Commonwealth of Pennsylvania v. O'Neill,* 348 F.Supp. 1084 (E.D.Pa.1972), *aff'd in part,* 473 F.2d 1029 (3rd Cir. 1973); *EEOC v. Local 638 of The Sheet Metal Workers International Association,* 532 F.2d 821 (2nd Cir. 1976). In the entry level quota it is difficult to determine who it is that is being kept out and therefore less objectionable as a temporary remedy imposed by the courts pursuant to Section 706(g) of Title VII. However, where the indefinite quota, whether court imposed or voluntary, is in the area of promotions and prior discrimination has not been shown to exist with regard to the same, regardless of whether discrimination did or did not occur at the entry level, this is the type of narrowly focused ascertainable discrimination which is forbidden under Title VII of the Act.

Accordingly, for the reasons set forth above, the Court is bound, as a matter of law, to conclude that the defendants' voluntary affirmative action plan violates

Sections 703(a), (e), (h), (j) and 706(g) of Title VII of the Act. Moreover, inasmuch as the Court's Findings of Fact demonstrate that defendants have received federal financial assistance in connection with their racial preference plan the Court is bound to conclude, as a matter of law, that defendants have also violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[80] *Flanagan v. President & Directors of Georgetown College,* 417 F.Supp. 377 (D.C. D.C.1976); *Anderson v. San Francisco Unified School District,* 357 F.Supp. 248 (N.D. Cal.1972); *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. 955, (D.C.Cal.1977). Additionally, the Court concludes, as a matter of law, that the defendants have violated 42 U.S.C. § 1981.[81] *Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir. 1974); *Haber v. Klassen, supra; McDonald v. Santa Fe Trail Transportation Co., supra.*

### State Statutory Claims

In addition to the Title VII violation plaintiffs have argued that the defendants' promotional practices violated the Michigan Fair Employment Practices Act, Michigan Compiled Laws Annotated § 423.301, *et seq.,* and the Michigan Civil Rights Act of 1977, Michigan Compiled Laws Annotated § 37.2101 *et seq.*[82]

An examination of these Acts reveals no provision which would allow a racial promotion system that in operation causes persons to be passed over solely because of their race. On the contrary, Sections 303[83] and 2202[84] would indicate a prohibition on the part of the employer from imposing arbitrary and discriminating promotional quotas.

■ A reading of these sections and Michigan precedent is persuasive authority that the quota system as advocated by defendants denies the plaintiffs their entitled promotions on the sole basis that they are white. *White v. Motor Wheel Corp.,* 64 Mich.App. 225, 236 N.W.2d 709 (1975); *Chrysler Corp. v. Civil Rights Commission,* 68 Mich.App. 283, 242 N.W.2d 556 (1976); *Rand v. Civil Service Commission,* 71 Mich. App. 581, 248 N.W.2d 624 (1976). Consequently, such a denial is a violation of both the Fair Employment Practices Act and the Michigan Civil Rights Act of 1977. *Accord, Lige v. Town of Montclair, supra; Chmill v. City of Pittsburgh, supra.*

### The Constitutional Challenge

■■ The clear purpose of the Fourteenth Amendment of the United States Constitution is the prevention of invidious discrimination against individuals or groups on the basis of race. *Washington v. Davis, supra; Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Classification based upon race renders the classification constitutionally suspect and subject to the most rigid judicial scrutiny. *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Loving v. Virginia, supra.*

**80.** 42 U.S.C. § 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**81.** 42 U.S.C. § 1981 provides in part: "All persons within the jurisdiction of the United States shall have the same rights in every State and Territory to . . . the full and equal benefit of all laws . . . as is enjoyed by white citizens."

**82.** The Fair Employment Practices Act, M.C. L.A. § 423.301 *et seq.,* was repealed on March 31, 1977 and replaced by the Michigan Civil Rights Act of 1977, M.C.L.A. § 37.2101 *et seq.* The new act is patterned after Title VII of the Civil Rights Act of 1964, as amended in 1972.

**83.** M.C.L.A. § 423.303(a) provides in part "It shall be an unfair employment practice: For any employer, because of race . . . to discriminate . . . ."

**84.** M.C.L.A. § 37.2202(1)(a) provides in part "An employer shall not: . . . discriminate against an individual with respect to employment because of . . . race . . . ."

It cannot be seriously disputed that purposeful racial classifications in the area of promotions did, in fact, exist and discriminated against whites. Therefore, not only must the purpose of the classification serve a compelling state interest, but it must be demonstrated by rigid judicial scrutiny that there is no reasonable way to achieve the states' goals by means which impose a lesser limitation on the rights of the group disadvantaged by the classification. *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Associated General Contractors of California v. Secretary of Commerce, supra.*

Initially, defendants seek to satisfy the rigid standard and justify the 50% racial preference plan on the ground of historical unconstitutional discrimination against blacks in the Detroit Police Department, both in hiring and in promotions. They contend that the Constitution required installation of the racial preference plan as a remedy for its prior constitutional violations.[85]

It is clear that to the extent that defendants have relied upon statistical comparisons showing disparate impact as proof of former constitutional violations against blacks they have fundamentally misconceived the constitutional rule. In *Washington v. Davis, supra,* the Supreme Court stated that when employment discrimination on the basis of race is claimed a *purpose to discriminate* must be shown. Specifically, the Court stated:

"We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today . . . But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact . . . Nevertheless, we have not held that a

law, neutral on its face and serving ends otherwise within the power of government to pursue is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justified only by the weightiest considerations . . . " *id.* 426 U.S. at 239, 242, 96 S.Ct. at 2047.

It is clear that, standing alone, statistics showing disparate impact do not prove a constitutional violation. Recognizing that decisions existed holding to the contrary which could create a persisting doubt, the Court further stated, in erasing such doubt, as follows:

"The cases impressively demonstrate that there is another side to the issue; but, with all due respect, to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement." *id.* at 244–245, 96 S.Ct. at 2050.

Aside from statistical comparisons defendants have claimed that prior to the installation of the voluntary "affirmative action" plan blacks were treated differently than whites, essentially a claim of disparate treatment. While there was no evidence in this record showing such an allegation to be true, even if defendants had shown prior differential treatment to blacks vis a vis whites the claim of prior unconstitutional discrimination against blacks, without more, would fall short of a constitutional violation as it must be shown that the alleged differential treatment was *because* of the race of the group. Proof of discrimina-

---

**85.** The Court has previously addressed this argument posited against Title VII and found it to be without legal viability.

**1014**

tory *purpose, intent,* or *motive,* be it evil or innocent, is required and absent such proof, as in the case at bar, there can be no constitutional violation.[86] *International Brotherhood of Teamsters v. United States, supra.*

■ Regardless of whether defendants' prior unconstitutional claim of discrimination against blacks is characterized as one of disparate impact or differential treatment, in order to establish a prior constitutional violation discriminatory *purpose* must be shown. In many cases an invidious discriminatory purpose may be inferred from the totality of the facts. In this case the totality of the facts dispels any such conclusion and merely reinforces the inference that the claim of intentional purposeful discrimination against blacks was but a mere afterthought by the defendants in an attempt to achieve racial balance on the police force as the record is absolutely void of prior discriminatory purpose on the part of defendants towards blacks.

■ A second consideration which defendants have relied upon to justify the adoption of the racial preference plan has been a claimed risk of loss of Federal funds because of threats from the LEAA. Aside from the fact that such an assertion is not borne out by the evidence, it is wholly lacking in legal validity. The LEAA is not vested with the authority to condition grants upon the adoption of a quota system or to discontinue grants because of a refusal to adopt the same. Nor can the LEAA, unilaterally and without due process, terminate or suspend payments. 42 U.S.C.

§ 3766; 28 C.F.R. § 42.201 *et seq.* Clearly, defendants' threat of loss claim falls far short of the "compelling state interest" contemplated by the United States Supreme Court.

■ Finally, it is urged that certain "operational needs" required greater numbers of blacks on the police force. The claim of operational needs is premised upon the belief that the population of the City of Detroit, which is largely black, will cooperate more freely with a police department·which racially reflects the makeup of the people it serves. In turn, crime will be reduced and the effectiveness of the department will be increased. These provincial beliefs are not borne out by the evidence as determined by the Court's Findings of Fact. Moreover, the Court would cite as forceful rejection to the narrowness implicit in the defendants' racial exclusivity concept the dissenting opinion of Justice Douglas in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

"The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized. The purpose of the University of Washington cannot be to produce black lawyers for blacks, Polish lawyers for Poles, Jewish lawyers for Jews, Irish lawyers for Irish. It should be to produce good lawyers for Americans . . . " *id.* at 342, 94 S.Ct. at 1718.

■ The evil of the departmental quota system lies in its effect, not in its "affirmative action" name.[87] While the

---

**86.** Regarding the plaintiffs' constitutional ground of race discrimination the evidence of discriminatory purpose and motive permeates the record. The fact that defendants claim their purpose is *innocent* is irrelevant. The crucial factor is only that plaintiffs were *purposely* treated different than blacks *because* of their race as the purpose need not be malignant.

**87.** "Affirmative Action", as the Court would define it, means nothing more than taking *immediate* measures to eliminate existing employment practices and procedures which discriminate against *any* group and creating, in their place, employment policies, practices and pro-

cedures designed to achieve equal *opportunity* for all. Of course, it encompasses providing remedies for those *identifiable individuals* who have been subjected to past discrimination. Many employers and employees, as well as the public at large, view affirmative action as requiring equality of result or proportionate representation in employment—thus mandating quotas to all minority groups regardless of whether they, as individuals, have been disadvantaged or discriminated against in the past. When viewed in this manner "affirmative action" is not only a vile misnomer but acts as the antithesis of equal opportunity. Clearly, if "affirmative action" is a term mandating equal-

purpose of a quota system is generally compassionate its effect is intolerable because it denigrates individuals by reducing them to a single immutable birth characteristic—skin pigmentation. The concept of a quota disregards the fact that persons are not fungible goods and that special qualifications may be required for the job in question. It prefers some while excluding others on the basis of an attribute totally unconnected with the merits of the promotional candidate. As Justice Douglas stated in *DeFunis:*

> "There is no constitutional right for any race to be preferred. The years of slavery did more than retard the progress of blacks. Even a greater wrong was done the whites by creating arrogance instead of humility and by encouraging the growth of the fiction of a superior race. There is no superior person by constitutional standards. A DeFunis who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability, no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner." *id.* at 336–337, 94 S.Ct. at 1716.

Racial discrimination is as indefensible when practiced against whites as it is when practiced against blacks and does not become "reverse" merely because it is practiced against whites. "Reverse" discrimination is a misnomer as racial discrimination knows neither a course nor a direction. The keystone of a democratic government is the concept of equality, and to judge discrimination against whites in a different manner, when the same discrimination is practiced against blacks, would be to resurrect the "separate but equal" doctrine, a philosophy presumably buried long ago.

The goal of equal opportunity in employment is a laudable one, but cannot be achieved by the use of a racial quota which necessarily runs counter to the constitutional mandate of the Fourteenth Amendment. Inevitably race quotas do not accomplish the result of equal employment opportunity.[88] The polarization of races that quotas exhibit creates a divided police department—instead of unifying and strengthening it, the quota underscores differences and sows seeds of internal hatred. To sanctify the department's quota would be to judicially insult the black police officers of the department. In effect the Court would be telling them that a quota is needed in order for them to obtain a promotion. Lack of a sense of selfworth is one of the major ills of the legacy of discrimination and should not be reinforced by telling these officers that they owe their position to a quota. As the California Supreme Court states in *Bakke v. Regents of University of California,* 18 Cal.3d 34, 132 Cal. Rptr. 680, 553 P.2d 1152 (1976) *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977):

> "The divisive effect of such preferences needs no explanation and raises serious doubts whether the advantages obtained by the few preferred are worth the inevitable cost to racial harmony.[32] The overemphasis upon race as a criterion will undoubtedly be counterproductive: rewards and penalties, achievements and failures, are likely to be considered in a racial context through the school years and beyond. Pragmatic problems are certain to arise in identifying groups which should be preferred or in specifying their numbers, and preferences once established will be difficult to alter or abolish; human nature suggests a pre-

---

ity of *result* then this country is not far from rejection of the concepts of individual merit and achievement—concepts which made this country the great nation that it is today.

**88.** Even if defendants had proven prior discrimination against blacks the quota does not have the quality of providing that those victims of

the prior discrimination are in fact made whole or that the discriminators are punished. Many of those preferred are merely the recipient of a gratuity that respectfully belongs to another. So too, many of those victimized by the quota may have had absolutely no connection with the prior discrimination.

ferred minority will be no more willing than others to relinquish an advantage once it is bestowed. Perhaps most important, the principle that the Constitution sanctions racial discrimination against a race—any race—is a dangerous concept fraught with potential for misuse in situations which involve far less laudable objectives that are manifest in the present case." (footnote omitted).

If better public communication would exist by hiring more blacks and promoting more blacks to supervisory positions then the problem lies in a racially motivated populus. In the eyes of this Court catering to such racial prejudice cannot be said to be "compelling". On the contrary, the Court would consider it to be pandering. If the defendants' claim of "operational need" can be considered as compelling then apparently any all white community, via the police department, could lay claim to such a "compelling interest" in forming a basis to reject all non-whites.[89]

No one can doubt that a police officer is a professional in every sense of the word. Ordinarily he makes more decisions and exercises broader discretion day in and day out than a judge does in a week. Indeed, these professionals have only minutes— sometimes seconds—to make decisions that perplex experienced judges for months, who may even then divide five to four or two to one. Our society expects that these professional officers will not only enforce the law in determining what constitutes a constitutional arrest or search but also act as a curbside psychiatrist, social worker, legal adviser, minister and doctor. Cognizant of these factors the tax paying community is entitled to the services of the most qualified police officers and supervisors available— without regard to unconstitutional racial considerations. Those who would have this Court do otherwise do violence to common sense.

Defendants have claimed that "what is a good social policy is good law".[90] Whether or not a quota is good social policy, the Court holds it to be unconstitutional law insofar as it allows discriminatory promotions. *Cramer v. Virginia Commonwealth University*, 415 F.Supp. 673 (E.D.Va. 1976). Until racial discrimination is uprooted from employment practices the seeds of racial harmony will never be sown either in this city or the country. However, the fact that a racial group, *any* racial group, suffered its own special injustice does not make one such group different in the eyes of the law—for the remedy for racial discrimination is not more racial discrimination. In this day and age race is an impermissible criterion for judging either the employee's qualifications or the employer's needs. As the Court states in *Commonwealth of Pennsylvania v. O'Neil, supra,*

"In our democracy rights are accorded primarily to individuals, as distinguished from groups. Opening the doors long shut to minorities is imperative, but in so doing, we must be careful not to close them in the face of others, lest we abandon the basic principle of non-discrimination that sparked the effort to pry open those doors in the first place." 4 F.E.P. Cases 1289–1290.

To uphold the department's promotional policies and practices would be to adopt an approach profoundly at odds with the traditions of individual merit and race neutrality, concepts implicit in the Constitution and of fundamental importance to *all* races. Cognizant of the fact that we are indeed a nation of minorities and believing in equality of *opportunity* and non-discrimination in every phase and activity of human life, the Court holds, as it must if it is to live by the Constitution, that the racial preference promotional practices of the Detroit Police Department cannot withstand a constitutional assault and violate the rights guaranteed to whites by the Equal Protection Clause of the Fourteenth Amendment of the United

---

**89.** Chief Hart, a black, agreed with such logic when questioned by the Court whether Dearborn, an essentially all-white community, could reject blacks on this basis.

**90.** Testimony of defendant Avern Cohn, November 11, 1977. Mr. Cohn is an attorney and former member of the Michigan Civil Rights Commission.

States Constitution, Section 1983 of Title 42 of the United States Code, and Article I section 2 of the Constitution of the State of Michigan.

In view of all of the above considerations, it is the conclusion of this Court that judgment be entered in favor of the plaintiffs, and against defendants, granting a permanent injunction restraining defendants from any further implementation of affirmative action or any other program that offends the Equal Protection Clause of the Fourteenth Amendment, and Section 2000e-2(a) and (j) of Title VII. Henceforth, race shall not be a factor to be considered in the promotional practice of defendants.

An appropriate Order shall issue.

Acey ATKINS, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant.

No. 76 C 4242.

United States District Court, N. D. Illinois, E. D.

Feb. 27, 1978.

Sheldon A. Harris, Chicago, Ill., for plaintiff.

Thomas P. Sullivan, U. S. Atty., Marvin E. Gavin, Regional Counsel, Dept. of Health, Education & Welfare, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

CROWLEY, District Judge.

The plaintiff appeals from the denial by the Secretary of Health, Education and Welfare of his application for the establishment of a period of disability under § 216(i) of the Social Security Act, 42 U.S.C. § 416(i), and for disability insurance benefits under § 223 of the Act, 42 U.S.C. § 423. Before the Court are cross-motions for summary judgment. After review of the record under the narrow scope provided in 42 U.S.C. § 205(g) which allows us only to determine whether the final decision of the Secretary is supported by substantial evidence, based on the record as a whole, *Moon v. Celebrezze,* 340 F.2d 926 (7th Cir., 1965), plaintiff's motion is granted for the reasons noted below.

Mr. Atkins filed his application for disability benefits on February 5, 1974, alleging that he became unable to work in February, 1971. The application was denied and that denial was affirmed after reconsideration by the Bureau of Disability Insurance of the Social Security Administration. An administrative law judge considered the case de novo and heard testimony from the plaintiff, his attorney and a vocational expert in addition to receiving extensive medical records and reports into evidence. On August 19, 1976, the administrative law judge found that the plaintiff was not under a disability on June 30, 1976 when he last had the necessary insured status; the Appeals Council affirmed that decision on December 8, 1976.

The testimony and written documents produced during the course of these proceedings have provided a substantial amount of information. Mr. Atkins was born in Mississippi in 1927 and although he attended school through the fourth grade, he cannot read or write. After years of work in Mississippi as a farm laborer he came to Chicago where from 1965 to 1971 he worked as a cabinet inspector for the Zenith Radio Corporation. It is undisputed that he slipped and fell on a patch of ice in the company parking lot in February of 1971; the plaintiff dates his disability from this time and alleges that his back trouble is compounded by nervous heart, arthritis and loss of sight in his right eye.

On his own behalf, Mr. Atkins testified that he discontinued working in February, 1971, upon the direction of the doctor to whom he was sent by his employer, the Zenith Corporation. Therapy treatments, medication and a back brace were prescribed, and he made other visits to clinics and physicians, but was never hospitalized for the back condition which persisted. A widower, he now lives alone except for the assistance of a teenage daughter who does the shopping, housekeeping and all but some of the light cooking. Sometimes he goes to church, but he can no longer drive an automobile, walk for more than a short period of time, or bend and lift objects from a level below his waist. He has had no employment since 1971 and subsists on payments from sources of public aid.

The medical evidence was collected from a variety of sources. It was undisputed that the plaintiff was hospitalized for eye surgery in 1973 and that he now suffers from severely limited vision of the right eye. As to the reports from physicians concerning the condition of the plaintiff's back and lower extremities, there are numerous test results and written evaluations, five produced by the plaintiff in support of his claim and two solicited by the Secretary. All of the reports submitted by doctors who have treated and examined plaintiff over a period of time have diagnosed inability to resume his former employment.[1] In con-

---

1. On April 20, 1971, Dr. Ernest Olivieri, a general practitioner, advised limited activity and noted that the prognosis for improvement was guarded.

After June 18, 1971, Dr. Samuel Rubert, an industrial orthopedist, found residual complaints and findings to be disabling for heavy work, with only a possibility of light work

---

because of lack of use of 35% of the right leg and 25% of the left leg.

On March 14, 1974, Dr. L. Gluckman, an internist now deceased, made an examination and noted limitations on movement in the lumbar area and mild arthritic changes.

On December 14, 1975, Dr. Robert Busch, an orthopedic surgeon, after examination and testing, found the plaintiff disabled for return to work.

On June 28, 1976, Dr. Gerald Owen McDonald, the plaintiff's current treating surgeon, concluded that the damage to the lower back

and extremities rendered the claimant completely disabled and unable to perform any job.